**[This opinion has been published in *Ohio Official Reports* at 86 Ohio St.3d 431.]**

WIGHTMAN ET AL., APPELLANTS AND CROSS-APPELLEES, *v.* CONSOLIDATED

RAIL CORPORATION, APPELLEE AND CROSS-APPELLANT.

[Cite as *Wightman v. Consolidated Rail Corp.*, 1999-Ohio-119.]

*Torts—Negligence—Damages—Plaintiff who accepts a remittitur may appeal trial*
*court's determination of damage issue, when—If reviewing court finds no*
*error in determination of damages, plaintiff's prior acceptance of judgment*
*for reduced amount will be affirmed unless result of principal appeal*
*requires otherwise.*

A plaintiff who accepts a remittitur may appeal the trial court's determination of
the damage issue if the opposing party appeals any issue. If the reviewing
court finds no error as to the determination of damages, the plaintiff's prior
acceptance of judgment for the reduced amount will be affirmed unless the
result of the principal appeal requires otherwise.

(No. 97-2342—Submitted November 10, 1998—Decided September 15, 1999.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Erie County, No.

E-97-001.

———————————

{¶ 1} On February 18, 1989, a Consolidated Rail Corporation ("Conrail")
freight train collided with a car driven by Michelle Wightman, killing her and her
passenger, Karrie Wieber. Michelle's mother, Darlene M. Wightman, owned the
car. Darlene Wightman sued Conrail as administrator of her daughter's estate for
wrongful death and on her own behalf for the destruction of her automobile.

{¶ 2} The collision occurred as Michelle Wightman attempted to negotiate
a railroad crossing on Remington Avenue in Sandusky. A Conrail train, SEEL-7,
had experienced mechanical difficulty and sat stopped on the track approximately

two hundred eight feet from the grade crossing at Remington Avenue. Due to its position when it stopped, SEEL-7 activated the crossing's flashing lights and gates.

{¶ 3} Witnesses differed on how long SEEL-7 was stopped prior to the crash. One witness estimated that he first observed the stopped train at about 10:30 p.m., about ninety minutes prior to the crash. The train's crew estimated that the train had stopped somewhere between 11:00 p.m. and 11:30 p.m. SEEL-7's conductor, Terry Warner, and its head brakeman, Leroy Powell, saw that the gate arms were down at the crossing and that traffic was nonetheless proceeding. They recognized that a dangerous situation existed at the crossing. However, they decided not to post a flagman at the crossing, and instead the two walked the length of the train to find and repair the mechanical problem. Warner described their decision as "our only option."

{¶ 4} The engineer in SEEL-7's lead engine also saw the heavy Saturday evening traffic moving over the crossing. He saw no one attempting to turn around and avoid the crossing. While SEEL 7 was stopped, another train, TVLA, went over the crossing without incident, traveling at about seventy miles per hour. Radio communications alerted the SEEL-7 crew that another train, TV-9, was approaching the crossing. TV-9 would ultimately smash into the car driven by Michelle Wightman.

{¶ 5} About twenty minutes prior to the crash, a Sandusky police officer, Lonnie Newell, came upon the scene. Officer Newell saw that SEEL-7 created a dangerous obstruction and requested his dispatcher to advise Conrail of the situation. Satisfied that Conrail had been notified, Officer Newell left the crossing to undertake a traffic stop and issue a verbal warning to a driver who had driven around the gates.

{¶ 6} Shortly after Officer Newell left the scene, sixteen-year-old Michelle Wightman approached the crossing. Several cars in front of the Wightman car successfully proceeded over the crossing. Michelle Wightman slowly followed.

2

But, as one witness said, "They didn't have a chance * * *." Before the Wightman car cleared the crossing, the TV-9 train emerged at a speed of almost sixty miles per hour and struck the car broadside, instantly killing both occupants.

{¶ 7} On October 30, 1990, a jury awarded the estate of Michelle Wightman $1,000,000 in compensatory damages, allocating sixty percent of the causal negligence to Conrail and forty percent to Michelle Wightman. The jury also found Conrail liable for the damage to Darlene Wightman's property and determined that Conrail should pay punitive damages on Darlene Wightman's claim.

{¶ 8} At the time of the trial, former R.C. 2315.21(C)(2) provided for bench proceedings to determine the amount of punitive damages. The trial judge held that no punitive damages should be awarded.

{¶ 9} The Sixth District Court of Appeals upheld the compensatory award to the estate, but reversed the trial court's failure to award punitive damages on Darlene Wightman's claim. The appellate court found "that there was clear and convincing evidence to support the jury's finding of actual malice on the part of appellant [Conrail]." 94 Ohio App.3d 389, 408, 640 N.E.2d 1160, 1173. The appellate court remanded the matter to the trial court "for determination as to the amount of punitive damages to which appellee, Darlene Wightman, is entitled in accordance with this opinion." *Id.* at 409, 640 N.E.2d at 1173. On September 14, 1994, this court declined to hear Conrail's appeal. 70 Ohio St.3d 1442, 638 N.E.2d 1044.

{¶ 10} After the case was remanded to the trial court, but before the trial court entered an amount of punitive damages, this court declared R.C. 2315.21(C)(2) unconstitutional as a violation of the right to trial by jury. *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, paragraph two of the syllabus. Therefore, the amount of punitive damages to assess against Conrail became a jury issue.

**{¶ 11}** A second jury was convened to determine that issue, and that trial began on May 20, 1996. On that same date, the trial court granted the motion to intervene of the Michelle Wightman Charitable Foundation, to which Darlene Wightman had apparently assigned not less than one-half of any punitive damages award. The foundation was not permitted to participate in the trial, however.

**{¶ 12}** At the trial, the plaintiffs presented evidence of the events surrounding the collision, and that evidence generally mirrored the evidence that had been presented in the first trial. The jury heard testimony from plaintiffs' expert, Dr. William D. Berg, a civil engineer with a special interest in grade-crossing safety. According to Dr. Berg, the railroad industry has known for decades that when gates at a crossing are allowed to remain down for an unusual length of time, drivers will proceed over the crossing. He testified that the danger of a crash is particularly great when there is an obstruction on the track. Dr. Berg testified that a large number of the collisions that occur every year at grade crossings happen under conditions "substantially similar" to those which existed at Remington Avenue.

**{¶ 13}** Dr. Berg testified that Conrail could have easily prevented the collision by placing a flagman at the crossing to stop traffic when a train was approaching, slowing the speed of the TV-9, or blocking the crossing with the SEEL-7 engine when a train was approaching.

**{¶ 14}** The trial court prohibited Conrail from introducing evidence it had introduced at the first trial regarding certain circumstances surrounding the accident, which focused for the most part on the contributory negligence of Michelle Wightman. The court granted plaintiffs' motions *in limine* regarding evidence of Michelle Wightman's .039 percent blood-alcohol level at the time of the accident, and evidence that her mother may have provided her with some alcohol. The court also granted plaintiffs' motion *in limine* regarding the testimony from a Conrail expert regarding the effect that alcohol and a driver's age might

have in a railroad-crossing collision. The court found that the negligence of Michelle Wightman was not a part of the punitive damages case.

{¶ 15} The court also granted plaintiffs' motions *in limine* regarding the first trial judge's decision to award no punitive damages and references that the first jury had found Michelle forty percent contributorily negligent. The court also prohibited references to the fact that Conrail had paid $1,000,000 in compensatory damages for the wrongful death of Michelle Wightman.

{¶ 16} On May 23, 1996, the jury awarded Darlene Wightman $25,000,000 in punitive damages against Conrail. On June 7, 1996, Conrail filed a motion for remittitur or, in the alternative, for a new trial. The railroad's motion also sought relief from post-judgment interest on the punitive damages award.

{¶ 17} The court granted a remittitur of $10,000,000, finding that a $15,000,000 punitive damages award would "sufficiently punish Conrail and create a positive inducement to change its practices, rather than continue to challenge the findings of the earlier jury and the Court of Appeals."

{¶ 18} The trial court also granted Conrail relief from post-judgment interest, despite finding "no conclusive authority in support of Conrail's request." The trial court reasoned that since punitive damages are not compensatory, interest on the amount to compensate for delay in payment may not be necessary.

{¶ 19} Darlene Wightman consented to the remittitur, but both parties appealed aspects of the trial court's ruling. Conrail appealed the jury award as grossly excessive, and also appealed the trial court's aforementioned evidentiary rulings. Conrail also claimed that the trial court erred in admitting Dr. Berg's testimony.

{¶ 20} Darlene Wightman cross-appealed, challenging the remittitur. Darlene Wightman also appealed the trial court's grant of relief from post-judgment interest on the punitive damages award.

**{¶ 21}** The court of appeals affirmed the trial court in all regards. The court found the remittitur not appealable pursuant to this court's decision in *Scioto Mem. Hosp. Assn. v. Price Waterhouse* (1996), 74 Ohio St.3d 474, 479, 659 N.E.2d 1268, 1273. Plaintiffs had urged the court to adopt the "Wisconsin rule" regarding the appealability of remittiturs, whereby a plaintiff may appeal a remittitur to which it consents if the defendant first initiates an appeal. The appellate court declined to adopt the Wisconsin rule. Both parties have appealed to this court.

**{¶ 22}** The cause is before this court upon the allowance of a discretionary appeal and cross-appeal.

_____

*Murray & Murray Co., L.P.A., Thomas J. Murray* and *Mary O'Neill*, for appellant and cross-appellee Darlene M. Wightman.

*Cavitch, Familo, Durkin & Frutkin, Harvey L. Frutkin* and *Kerin Lyn Kaminski*, for appellant and cross-appellee Michelle Wightman Charitable Foundation.

*Ralph G. Wellington, pro hac vice, Nancy Winkleman, pro hac vice,* and *Arlin M. Adams, pro hac vice; Vogelgesang, Howes, Lindamood & Brunn, Philip E. Howes* and *Thomas R. Himmelspach*, for appellee and cross-appellant Consolidated Rail Corporation.

*David E. Neumeister, pro hac vice, James K. Horstman, Richard Hodyl* and *Lloyd E. Williams, Jr.*, urging reversal on cross-appeal for *amici curiae*, National Association of Independent Insurers and Alliance of American Insurers.

*Stanton G. Darling II*, urging reversal on cross-appeal for *amici curiae*, Product Liability Advisory Counsel and National Association of Manufacturers.

*Buckingham, Doolittle & Burroughs, L.L.P.*, and *Scott A. Richardson,* urging reversal on cross-appeal for *amicus curiae*, Ohio Association of Civil Trial Attorneys.

*Allen Schulman & Assocs. Co., L.P.A.*, and *Allen Schulman, Jr.; Clark, Perdue, Roberts & Scott Co., L.P.A.*, and *Paul O. Scott*, urging reversal on appeal for *amicus curiae*, Ohio Academy of Trial Lawyers.

*Squire, Sanders & Dempsey* and *Charles F. Clarke*, urging reversal on cross-appeal for *amicus curiae*, Association of American Railroads.

————————————

**PFEIFER, J.**

{¶ 23} We affirm the lower court decisions on the evidentiary matters in this case. We find that the punitive damages award with remittitur is not excessive and is constitutional. We reverse the lower court on the issue of appealability of a remittitur and adopt the "Wisconsin rule" on that issue. We find that the trial court did not abuse its discretion in ordering a remittitur. Finally, we reverse the lower court on the issue of relief from post-judgment interest on a punitive damages award.

Evidentiary Issues

{¶ 24} We find that the trial court acted within its discretion in granting the motions *in limine* that plaintiffs sought. Despite its claims to the contrary, Conrail was not precluded from mounting a defense.

{¶ 25} The purpose of the latest incarnation of this case was to determine how much Conrail should pay in punitive damages. Liability and actual malice on the part of Conrail had already been determined at an earlier trial. This court held in *Schellhouse v. Norfolk & W. Ry. Co.* (1991), 61 Ohio St.3d 520, 524-525, 575 N.E.2d 453, 456, that "[a]cts committed with actual malice constitute behavior qualitatively different from that which may be characterized as merely negligent" and, therefore, contributory negligence is not available as a defense where conduct in conscious disregard has been established. Thus, since contributory negligence was not a part of this case, the trial court properly prevented the introduction of evidence that Michelle Wightman had consumed a small amount of alcohol prior

to the collision, and that the alcohol may have been provided to her by her mother. The testimony of Dr. Herbert Moskowitz was based on the effects Michelle Wightman's youth and drinking might have had on the accident, and was also properly excluded.

**{¶ 26}** Conrail also sought to have introduced to the jury certain findings from the first trial, including the compensatory damages paid to the estate and the trial judge's decision to award no punitive damages. We find that the trial court properly granted plaintiffs' motions *in limine* on those issues. The amount of compensatory damages awarded in the first trial to the estate is irrelevant to the punitive damages claim of Mrs. Wightman. Finally, the fact that the first trial judge abused his discretion and failed to award punitive damages is also irrelevant to the later punitive damages trial.

**{¶ 27}** Conrail also contends that the trial court erred in admitting certain testimony of plaintiff's expert, Dr. William Berg. Conrail objects to Dr. Berg's statement that, based on the statistics he has maintained for over twenty years, there are "in the order of 1,000 vehicle train collisions that were of magnitude that occurred at crossings that didn't have automatic warning devices, including gates per year." Dr. Berg also testified that "a large number of these collisions are occurring in situations that are substantially similar. And when I say substantially similar, what I'm saying is where you have got a loss of credibility because the signals are operative for an extended period of time and when you've got the obstructions."

**{¶ 28}** Conrail argues that Dr. Berg's testimony failed to meet the requirements of Evid.R. 703 and 705. Evid.R. 703 provides as follows:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

**{¶ 29}** Evid.R. 705 states:

"The expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."

{¶ 30} Conrail asserts that Dr. Berg's testimony violated Evid.R. 703 because he had no personal knowledge of the statistics he cited, and the statistics had not been introduced into evidence. With respect to Evid.R. 705, Conrail asserts that Dr. Berg did not identify the person or organization that maintains those statistics and did not disclose where the statistics are published.

{¶ 31} The decision of whether or not to admit evidence rests in the sound discretion of the court and will not be disturbed absent an abuse of that discretion. *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290, 292.

{¶ 32} We find that the trial court did not err in allowing Dr. Berg's testimony. There are certain things that an expert, by reason of his expertise, knows. Conrail does not claim that Dr. Berg did not qualify as an expert under Evid.R. 702. When providing background information, and not opining as to causation, we cannot expect an expert to footnote every statement with a recitation of his direct observation of the phenomenon, or a bibliography explaining how he knows his statement to be true.

{¶ 33} Dr. Berg was merely testifying as to facts in his area of expertise. A distinction can be made between background information and an opinion about causation. A doctor testifying in a medical malpractice case regarding a failed heart surgery, for instance, need not set forth the underlying facts regarding his knowledge of the basic makeup of the thoracic cavity. He does, however, have to set forth the facts underlying his opinion as to what caused the procedure to fail.

{¶ 34} Dr. Berg was setting forth background information so that the jury could draw its own conclusion. When testifying as to broad patterns rather than specific opinions, the same level of foundation is not required.

**{¶ 35}** Dr. Berg was open to aggressive cross-examination if Conrail thought his statistics were skewed or inaccurate. He was also open to rebuttal from Conrail witnesses. The trial court acted within its discretion in allowing the testimony of Dr. Berg.

**{¶ 36}** We therefore affirm the court of appeals on all of the evidentiary issues.

Excessiveness of Punitive Damages Award

**{¶ 37}** Conrail argues that the punitive damages award of $15,000,000 was grossly excessive and violated both Ohio law and the Due Process Clause of the United States Constitution. Conrail bases much of its argument regarding Ohio law on the ratio between the compensatory damage award and the punitive damages award. Mrs. Wightman's property loss was $2,400, and upon that loss was based the $15,000,000 punitive damages award, an amount 6,250 times greater than the compensatory award.

**{¶ 38}** In its brief, Conrail provides a survey of Ohio cases from October 1, 1986 to "the beginning of 1997" in which punitive damages were awarded, concluding that the greatest disparity between punitive and compensatory damages was 600 to 1. (Conrail conveniently ends its survey in "the beginning of 1997" before the award of a $6,000,00 punitive damages award on a $100 property damage claim, a 60,000 to 1 ratio, in *Garrett v. Consolidated Rail Corp.* [1997], 120 Ohio App.3d 378, 697 N.E.2d 1109, discretionary appeals not allowed in 80 Ohio St.3d 1444, 686 N.E.2d 273.) Conrail thus seems to indicate that if Michelle Wightman had been driving a car worth $25,000, a 600 to 1 ratio, the punitive damages award in this case would have been acceptable. Conrail's attempted use of ratios exemplifies why the determination of punitive damages is not a mathematical process.

**{¶ 39}** This court has stated that simply a large disparity between actual and punitive damages is not enough to set aside a jury's punitive damages award:

10

"Low compensatory damages and high punitive damages assessed by a jury are not in and of themselves cause to reverse the judgment or to grant a remittitur, since it is the function of the jury to assess the damages and, generally, it is not for the trial or appellate court to substitute its judgment for that of the trier of fact. A large disparity, standing alone, is insufficient to justify a court's interference with the province of the jury." *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464, 469.

{¶ 40} A large disparity is allowable because a punitive damages award is more about a defendant's behavior than the plaintiff's loss. "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331, 343. The value of the car Michelle Wightman was driving has little to do with how a jury might effectively and fairly punish and deter Conrail's conduct regarding the operation of its crossings. Tellingly, Conrail makes no argument that the punitive damages award was disproportionate as to its own income or net worth, but only that it was disproportionate to the value of the Wightman car.

{¶ 41} The trial judge in this case did an in-depth analysis of the appropriateness of the jury's award. He found an award of $15,000,000 to be appropriate. We have held that "the trial judge is in the best position to determine whether an award is so excessive as to be deemed a product of passion or prejudice." *Villella*, 45 Ohio St.3d at 40, 543 N.E.2d at 469. The trial judge believed a deterrent effect was necessary for Conrail because it was unwilling to accept responsibility for the collision. The trial judge found that Conrail's trial strategy "reflects a corporate attitude which clearly fails to recognize that the extremely dangerous practice which produced this catastrophic collision needs to be changed."

{¶ 42} A substantial harm, a continuing risk, a deterrent effect, and an economically viable company are factors that make a significant punitive damages

award appropriate in this case. We find that the punitive damages award was not excessive and did not violate Conrail's rights under Ohio law.

{¶ 43} Conrail also claims that the punitive damages award violates Conrail's due process rights under the United States Constitution. The United States Supreme Court has held that an award violates due process when it can be categorized as "grossly excessive" in relation to the state's legitimate interests in punishing unlawful conduct and deterring its repetition. *TXO Production Corp. v. Alliance Resources Corp.* (1993), 509 U.S. 443, 456, 113 S.Ct. 2711, 2719, 125 L.Ed.2d 366, 378.

{¶ 44} In *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, the court held that elemental notions of fairness "dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." 517 U.S. at 574, 116 S.Ct. at 1598, 134 L.Ed.2d at 826. The court discussed three guideposts that indicate whether a defendant has received adequate notice of the possible sanction. A lack of fair notice may render a sanction "grossly excessive."

{¶ 45} The guideposts set forth in *BMW* include the degree of reprehensibility of the defendant's conduct, the disparity between the harm suffered by the plaintiff and the amount of the punitive damages award, and the difference between the punitive damages award and civil or criminal penalties authorized or imposed in similar cases. 517 U.S. at 574-575, 116 S.Ct. at 1598-1599, 134 L.Ed.2d at 826. In *BMW*, the defendant sold a car to the plaintiff without disclosing that it had been damaged during shipping and had been repainted. Defendant, the national distributor of BMW automobiles, had a company policy of repainting cars that suffered minor, predelivery damage. The defendant notified neither its dealers nor its customers of the damage. The policy affected about one thousand automobiles. The trial jury awarded plaintiff $4,000 in compensatory damages and

$4,000,000 in punitive damages.  On appeal the Alabama Supreme Court ordered a remittitur in the amount of $2,000,000.

**{¶ 46}** The court in *BMW* described the degree of reprehensibility of the defendant's conduct as "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." 517 U.S. at 575, 116 S.Ct. at 1599, 134 L.Ed.2d at 826.  In overturning the punitive damages award in *BMW*, the court made special note that the harm inflicted on the plaintiff was purely economic in nature.  The court stated that "BMW's conduct evinced no indifference to or reckless disregard for the health and safety of others." 517 U.S. at 576, 116 S.Ct. at 1599, 134 L.Ed.2d at 827.

**{¶ 47}** It is with this guidepost, the most important one, that this case distinguishes itself the most from *BMW*.  Ineffective gates at a railroad crossing are of a completely different character than a painted-over scratch on a luxury automobile.  Literally and figuratively, we are dealing with the difference between a scratch and a cataclysm—the difference between a practice that might affect the value of an automobile by ten percent, and a practice that could result in massive property damage, physical injuries, and untold psychological pain.  Conrail evinced a disregard of the danger it posed to the health and safety of motorists.

**{¶ 48}** In this case, Conrail employees did nothing to warn drivers of oncoming trains, despite the fact that they saw vehicles crossing the track by driving around the gates.  Even after a phone call from police, Conrail did not take preventative measures to avert an accident. According to the trial judge, this tragic case has done little to persuade Conrail to change, citing Conrail's "corporate attitude which clearly fails to recognize that the extremely dangerous practice which produced the catastrophic collision needs to be changed."

**{¶ 49}** We find that Conrail's conduct reaches the level of reprehensibility sufficient to warrant the substantial punitive damages award the jury imposed in this case.

{¶ 50} The "second * * * indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." 517 U.S. at 580, 116 S.Ct. at 1601, 134 L.Ed.2d at 829. The Supreme Court has stated that the harm can include the harm likely to result from the defendant's conduct as well as the harm that actually has occurred. 517 U.S. at 581, 116 S.Ct. at 1602, 134 L.Ed.2d at 830. But the court, like this court, has consistently rejected the notion of a bright-line mathematical formula for the computation of the reasonableness of punitive damages awards. The court recognizes that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." 517 U.S. at 582, 116 S.Ct. at 1602, 134 L.Ed.2d at 831.

{¶ 51} We see the ratio between the compensatory and punitive damages as less relevant here because of the egregiousness of the act. The injury here was catastrophic and could have been financially more so. We are not persuaded that if Michelle Wightman had been driving a $40,000 BMW that would make a more acceptable ratio. An expensive car does not make the award more legitimate. The award stands on its own. This case offers one of those particular instances where a particularly egregious act has resulted in a small amount of economic damages.

{¶ 52} The third guidepost set forth in the *BMW* case is comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. In *BMW*, the court looked to the plaintiff's home state's Deceptive Trade Practices Act, which had a maximum penalty of $2,000. The court reasoned that that amount would not provide an out-of-state distributor with fair notice that a violation might subject an offender to a multimillion-dollar penalty. *Id*. at 584, 116 S.Ct. at 1603, 134 L.Ed.2d at 832.

{¶ 53} Conrail claims to have violated no Ohio statutes on the night of the accident. Conrail argues that even if it had not fully complied with all laws, the maximum federal penalty for the willful failure to comply with an order to remedy

a violation of signal-system safety regulations that creates an imminent danger of death or injury is $22,000 per violation. Section 209.409, Title 49, C.F.R.

{¶ 54} But the *BMW* case and its civil penalties are a world away from this case. *BMW* requires that the penalties imposed be for comparable misconduct. In *BMW*, the $2,000 fine actually applied to the specific conduct of the defendant that was at issue. The $22,000 fine Conrail refers to does not apply to the specific conduct involved in this case. The $22,000 fine applies to the failure to comply with an order to remedy a violation of signal-system safety regulations. An order has to have been made and disregarded by the railroad company for the fine to be imposed. It is not a fine for causing a death.

{¶ 55} The far more relevant civil "penalty" in cases like these is the potential civil damage award in a lawsuit. We agree with the trial court that Conrail could expect extraordinary civil damages from collisions it causes. Multiple passenger accidents where severe injuries occur could yield civil damage awards in the millions of dollars. Conrail could see this coming.

{¶ 56} There are no comparable statutory fines in this case to compare how the state deals with similar malfeasance. The trial court felt that criminal sanctions may have been in order in this case. The judge opined that "had the appropriate prosecuting authorities been made aware of all the facts and circumstances surrounding this tragic and unnecessary collision, those authorities would have been compelled to consider criminal prosecution, possibly for involuntary manslaughter."

{¶ 57} Thus, we conclude that the applicable criminal and civil penalties available were comparable to the punitive damages award.

{¶ 58} In considering the three guideposts set forth by the court in *BMW*, we find that Conrail had fair notice of the conduct that would subject it to punishment as well as the severity of the possible punishment. The award in this case was not grossly excessive and did not violate Conrail's due process rights.

**{¶ 59}** We therefore affirm the lower court on this issue.

Appealability of Remittitur by Plaintiffs

**{¶ 60}** Plaintiffs sought appellate review of the trial court's remittitur, arguing that since the court failed to find that the jury's award was excessive, remittitur was unavailable. Plaintiffs' first hurdle in that regard is the issue of the appealability of a remittitur. In *Scioto Mem. Hosp. Assn. v. Price Waterhouse* (1996), 74 Ohio St.3d 474, 479, 659 N.E.2d 1268, 1273, this court stated that "where a party voluntarily chooses to accept a remittitur, rather than a new trial, it cannot challenge that remittitur on appeal. *Iron RR. Co. v. Mowery* (1881), 36 Ohio St. 418, paragraph three of the syllabus." This court found the rule against appeal of remittiturs to be "fundamentally fair, as it simply binds a party to its election." *Id.*

**{¶ 61}** The different circumstances that this case presents have caused us to reconsider our endorsement in *Scioto* of *Iron RR.* There are issues of fairness and judicial economy surrounding this remittitur that were not a part of the case in *Scioto*. And certainly now judicial economy plays a more important role in our justice system than in did when *Iron RR.* was decided in 1881.

**{¶ 62}** Here, the trial court ordered the remittitur; in *Scioto*, it was the appellate court. The benefits to judicial economy are greater with a trial-level remittitur. Secondly, in this case the appropriateness of the punitive damages award was at the center of the defendant's appeal. We question the fairness of allowing one party to challenge the award without also allowing the other party to voice her own argument.

**{¶ 63}** This case has given us an opportunity to consider the value of remittitur and to contemplate the policy that best and most fairly supports its purposes.

**{¶ 64}** Overall, this case presents a compelling example of the worth of remittitur. The trial court's rationale in ordering remittitur was well intentioned. The court wrote in its opinion:

"This Court is concerned that if it simply overrules Conrail's motion lengthy appeals will ensue with potentially grave consequences for the safety of motorists using Conrail grade crossings. The Court, therefore, feels compelled, as a matter of public safety, to do everything in its power to [e]nsure that the purpose of punitive damages is promptly effectuated and that Conrail promptly changes the practice which produced this unnecessary tragedy. After much reflection, this Court has concluded that the most effective way to deter Conrail from continuing this practice is to remit the jury's verdict to an amount which would sufficiently punish Conrail and create a positive inducement to change its practices, rather than to challenge the findings of the earlier jury and the Court of Appeals."

**{¶ 65}** Remittitur plays an important role in judicial economy by encouraging an end to litigation rather than a new trial. The trial court sets forth persuasively the great value of a conclusion. There are times when an end has its own value, with justice delivered, and not further delayed. A final judgment brings closure, certainty, and possibly a commitment to changed future behavior. These are societal benefits as well as benefits to the parties. Wrongs are righted through judgments. Our justice system does not work without finality. Until then, the system's great value is in limbo. We take little from it, but we continually feed it with our energies, intellect, and emotions.

**{¶ 66}** The judge and both parties play a role in ending litigation. The law surrounding remittitur should reflect that. Under *Scioto*, defendants seek remittitur and benefit from it, but then can extend the litigation risk-free by appealing the remitted judgment. While remittitur is an effective tool at bringing about closure, it loses its vitality when it fails that important role. The plaintiff should not have to bear the brunt of its failure.

**{¶ 67}** Thus, for reasons of fairness and judicial economy, we adopt what has become known as the "Wisconsin rule." Pursuant to the Wisconsin rule, first enunciated in *Plesko v. Milwaukee* (1963), 19 Wis.2d 210, 220-221, 120 N.W.2d 130, 135, a plaintiff who accepts a remittitur may appeal the trial court's determination of the damage issue if the opposing party appeals any issue. If the reviewing court finds no error as to the determination of damages, the plaintiff's prior acceptance of judgment for the reduced amount will be affirmed unless the result of the principal appeal requires otherwise.

**{¶ 68}** The court's reasoning in *Plesko* mirrors our own concerns about fairness and judicial economy. The court wrote:

"The objective underlying the recommended procedure for granting an option to accept judgment for a reduced amount of damages in lieu of having a new trial, where the damages awarded by the jury are determined by the trial court to be excessive, is to avoid the delay and expense of an appeal or a new trial. In most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal or new trial. Nevertheless, if a party found liable to pay damages appeals the judgment resulting from the other party's accepting such reduced damages, this objective has been negatived. When plaintiff is forced to undergo an appeal by the action of an opposing party, after plaintiff has accepted judgment for such reduced damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages, especially if the plaintiff has accepted same only to avoid the delay and expense attending an appeal. Furthermore, the new rule herein announced may to some extent discourage appeals by the party held liable because of the possibility that the party who has accepted judgment for the reduced damages may prevail on his motion for review and have the jury's verdict reinstated." 19 Wis.2d at 221, 120 N.W.2d at 135.

{¶ 69} Remittitur works best where no appeal follows. A plaintiff accepts remittitur in lieu of a new trial. An appeal reopens the possibility of new trial, leaving the plaintiff with a reduced award that she cannot appeal. Defendants, as in this case, are able to attack that jury award on appeal. The goal of judicial economy is thwarted, and a defendant receives an unfair advantage as to what is appealable.

{¶ 70} We do not know whether the threat of appealability of the remittitur will persuade defendants not to appeal cases. However, if remittitur's benefit to judicial economy is thwarted by an appeal, the system operates more fairly under the Wisconsin rule.

{¶ 71} We therefore reverse the court of appeals on this issue.

The Remittitur in this Case

{¶ 72} A court has the inherent authority to remit an excessive award, assuming it is not tainted with passion or prejudice, to an amount supported by the weight of the evidence. In *Chester Park v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph three of the syllabus, this court set forth the specific criteria that must be met before a court may grant a remittitur: (1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the reduction in damages.

{¶ 73} The trial court in this case did state at one point in its opinion on remittitur that it was "not prepared to say that a verdict of $25,000,000 is excessive under Ohio law."

{¶ 74} The trial court was obviously not concerned with "magic words." But the court throughout its opinion did keep in mind the twin goals of punitive damages—punishment and deterrence. The court found that the award as remitted will "sufficiently punish Conrail and create a positive inducement to change its practices." The court reduced the award to an amount sufficient to promptly

effectuate the purpose of punitive damages. Damages allowed beyond that sufficiency would have been excessive.

{¶ 75} We find that the trial court did not abuse its discretion in concluding that a $15 million punitive damages award was sufficient to achieve the purpose of punishment and deterrence.

Post-Judgment Interest Relief

{¶ 76} The trial court granted Conrail relief from paying post-judgment interest on the punitive damages award. The court of appeals affirmed the trial court's decision. We find that the trial court's decision to relieve Conrail from paying interest on the punitive damages award was contrary to law.

{¶ 77} R.C. 1343.03(B), Ohio's interest statute, provides in relevant part:

"[I]nterest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct shall be computed from the date the judgment, decree, or order is rendered to the date on which the money is paid."

{¶ 78} The statute is direct and mandatory. The $15 million punitive damages award was a "judgment * * * for the payment of money rendered in a civil action based on tortious conduct." As such, the interest "shall be" computed from the date the judgment is rendered.

{¶ 79} The statute provides no wiggle room, and renders pointless any discussion about the philosophical underpinnings of punitive damages. The statute applies to judgments. This was a judgment. The statute applies and the interest clock ran from the date of the judgment.

{¶ 80} We therefore reverse the court of appeals on this issue.

{¶ 81} Accordingly, the judgment of the court of appeals is affirmed in part and reversed in part.

*Judgment affirmed in part
and reversed in part.*

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

20

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

_____

**MOYER, C.J., concurring in part and dissenting in part.**

{¶ 82} I concur with the judgment of the majority and with the reasoning in the majority opinion, except on the remittitur issue (Issue IV). I write separately because we are not required to reach the issue of whether a remittitur is generally appealable by the plaintiff. Therefore this is an inappropriate case for defining a new standard of law for Ohio.

{¶ 83} I would hold that where, as in the case before us, a trial court deems a jury award not to be excessive, the trial court lacks authority to offer a remittitur, and that it is an abuse of discretion to grant a new trial or offer a remittitur to reduce damages.

{¶ 84} Because the trial court here expressly determined that the jury did not award excessive punitive damages under Ohio law in returning a verdict of $25,000,000, the trial court had no authority to remit the jury award to $15,000,000. It therefore becomes necessary to reevaluate the appropriateness of the punitive damages award.

{¶ 85} The majority correctly states that, in lieu of ordering a new trial, a court has the inherent authority to remit an excessive award not tainted by passion or prejudice, if the plaintiff agrees to the remittitur. See, *e.g.*, *Larrissey v. Norwalk Truck Lines, Inc.* (1951), 155 Ohio St. 207, 44 O.O. 238, 98 N.E.2d 419, paragraph five of the syllabus; *Pendleton Street RR. Co. v. Rahmann* (1872), 22 Ohio St. 446.

{¶ 86} However, "[i]t is the function of the jury to assess the damages, and generally, it is not for a trial or appellate court to substitute its judgment for that of the trier of fact." *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464, 469. The trial court has only limited authority to offer remittitur. The concept of remittitur was developed to provide the trial court with an alternate

remedy, in the interest of judicial economy, by which it could correct an award that was legally excessive, thereby avoiding another trial.

{¶ 87} In *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph three of the syllabus, this court set forth the specific criteria that control the determination of a trial court to grant remittitur. One of these criteria is that the original jury award is found to be excessive. The majority cites this criterion, admits that the trial court did not meet it, and yet, accepts the trial court's order of remittitur.

{¶ 88} I have found no support for allowing a trial court to offer remittitur absent a finding that a jury's verdict of damages was excessive. To allow a court to offer remittitur simply because the trial court, as in this case, believes that a lesser award might help the defendant accept the verdict without challenge, would be to infringe improperly upon the plaintiff's right to a jury determination and could be viewed as encouraging defendants to threaten appeals and delay payment of verdicts.

{¶ 89} The trial court, in this case, originally filed a judgment entry ordering the defendant to pay the plaintiff the entire $25,000,000 in punitive damages that had been awarded by the jury. Following this judgment entry, the defendant moved for remittitur to an amount less than $1,200,000 on the grounds that the verdict was excessive and in violation of due process, or in the alternative, for a new trial on the grounds that the verdict was tainted with passion and prejudice. The court granted the motion for remittitur and denied the motion for a new trial. In doing so, the trial court cited *Chester Park*, including the criterion that the trial court find the damages award to be excessive. The trial court then specifically found that the damages awarded by the jury were not excessive under Ohio law and unconditionally denied the motion for a new trial. It nonetheless asked the plaintiff to agree to a remittitur.

**{¶ 90}** It is true that we must defer to the trial court's discretion, absent an abuse of discretion, when it determines a verdict to be legally excessive. See *Thompson v. Titus* (1959), 169 Ohio St. 203, 8 O.O.2d 166, 158 N.E.2d 357; *Larrissey* at 219-220, 44 O.O. at 243-244, 98 N.E.2d at 426. However, we cannot defer to a judgment that the trial court had no authority pursuant to statutory or common law to make.

**{¶ 91}** I would remand this case to the court of appeals to determine whether the trial court erred in concluding that the punitive damages award was not excessive.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

_____

**COOK, J., concurring in part and dissenting in part.**

**{¶ 92}** I concur in the decision to affirm the judgment of the court of appeals on the issues raised by Conrail on cross-appeal.

**{¶ 93}** I dissent, however, from the decision of the majority to depart from the precedent ratified just three years ago in *Scioto Mem. Hosp. Assn. v. Price Waterhouse* (1996), 74 Ohio St.3d 474, 479, 659 N.E.2d 1268, 1273, that binds a party to its acceptance of a remittitur. The majority decision to overrule this recent case rests on "[t]he different circumstances that this case presents," and to me that reasoning departs from the precept that a court's "judgment should be a declaration of legal principles rather than a determination of facts and circumstances." *Lamb v. Lehmann* (1924), 110 Ohio St. 59, 80, 143 N.E. 276, 282. Certainly a court should be vigilant in reviewing prior holdings for error and should retreat from erroneously decided precedent when justified. But "different circumstances" is not a reason that comports with the goals of neutrality and predictability.

**{¶ 94}** Because I would not overrule *Scioto*, I would affirm the court of appeals' decision that the remittitur is not appealable. I also would affirm the related determination of the court of appeals that because the remittitur judgment

denied post-judgment interest, plaintiff may not appeal that aspect of the remittitur either.

_____

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 95} I concur with the majority on the third (Appealability of Remittitur by Plaintiffs) and fifth issues (Post-Judgment Interest Relief), but respectfully dissent on the first (Evidentiary Issues), second (Excessiveness of Punitive Damages Award), and fourth issues (The Remittitur in this Case).

Excessiveness of Punitive Damages

and

The Remittitur in this Case

{¶ 96} I believe that the damages award in this case is, in essence, an award based on a wrongful death — the fact that Michelle Wightman was killed in this accident. Under Ohio law, punitive damages are not permitted in wrongful death cases. See *Rubeck v. Huffman* (1978), 54 Ohio St.2d 20, 23, 8 O.O.3d 11, 13, 374 N.E.2d 411, 413; *Schaefer v. D & J Produce, Inc.* (1978), 62 Ohio App.2d 53, 57, 16 O.O.3d 108, 111, 403 N.E.2d 1015, 1018-1019. The majority avoids addressing this issue, carefully referring only to the property damage of $2,400 as the point of comparison. Yet, the majority frequently refers to the "harm" created by the accident, such as referring to Conrail's actions as "a practice that could result in massive property damages, physical injuries, and untold psychological pain." By distinguishing this case from *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, on the basis of health and safety issues, the majority implicitly sanctions the punitive damages award for the wrongful death, *not* the comparatively minor property loss.

{¶ 97} By affirming an award of punitive damages that is 6,250 times the property damage award (even after remittitur), this court may encourage plaintiffs in wrongful death cases to include a property damage claim, no matter its value, to

use as a basis to recover exorbitant punitive damages. The result is, in essence, a judicially endorsed negation of Ohio's wrongful death statute. This court has now implicitly sanctioned punitive damages for wrongful death, despite the fact that a wrongful death claim exists only by statute and does not provide for punitive damages.

{¶ 98} Since the majority does not directly address this issue, presumably, the principle of law still stands that punitive damages cannot be awarded in a wrongful death claim. To the extent that the majority intended otherwise, I dissent.

Evidentiary Issues

{¶ 99} I believe that Conrail was wrongfully denied due process when it was not allowed to present a full defense in the remand trial. The Ohio Constitution mandates that due process be afforded to all litigants. "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean* (1914), 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363, 1369. See, also, *Mathews v. Eldridge* (1976), 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' "); *Brock v. Roadway Express, Inc.* (1987), 481 U.S. 252, 261, 107 S.Ct. 1740, 1747, 95 L.Ed.2d 239, 250.

{¶ 100} For over a century, the law in Ohio has been that when awarding punitive damages, a jury should consider *all* evidence, both aggravating and mitigating. *Schneider v. Hosier* (1871), 21 Ohio St. 98, 113-114. Due process and fundamental fairness require that the jury be informed of all of the circumstances in order to fully evaluate the defendant's conduct. Yet Conrail was prevented from presenting an effective defense because the trial judge in the retrial on the punitive damages issues excluded much of the testimony from the original trial. The second jury, in essence, heard only plaintiff's version of the events.

{¶ 101} I agree that to some degree an award of punitive damages may have been proper in the case. The majority clearly set forth the shortcomings of Conrail

in this matter. But Michelle Wightman was not without fault. There was testimony in the original case that had Wightman exercised caution, she could have avoided this accident. Yet this jury heard none of this evidence.

{¶ 102} In fact, the original jury found that Wightman was forty percent responsible for the accident. *That* jury heard evidence that Wightman was a young, inexperienced driver, having had her license for only six months. *That* jury heard how she had drunk two cans of beer and three wine coolers, supplied by her mother, before the accident. They also heard from another expert, Dr. Herbert Moskowitz, that this combination of factors increased Wightman's risk of accident by five hundred percent. *That* jury also had a vehicle dynamics event analysis from expert Deane H. Ellsworth that an unimpaired driver proceeding at her speed would have had time to see and avoid the oncoming train. The jury on remand was entitled to know that another jury had earlier found Wightman to be forty percent contributorily negligent.

{¶ 103} We do not know if the jury on remand, had it heard all of this evidence on remand, would have awarded the same amount of punitive damages. But we do know that the first trial judge, who did hear this evidence, refused to award any punitive damages at all — a sharp contrast to the second verdict of $25 million. That alone creates a very strong presumption of prejudice. By hearing Dr. William Berg's testimony only and no contradicting opinion on whether the accident was avoidable, the jury had no opportunity to judge the credibility of that testimony. Only by hearing all of the testimony could the jury on remand have effectively evaluated (1) whether to award *any* punitive damages, and (2) if so, how reprehensible Conrail's conduct was in light of the evidence adduced at the original trial that Wightman *could* have avoided the accident. Evidence of Wightman's contributory negligence was not sufficient to excuse Conrail from compensatory liability, but it may well have been sufficient to excuse Conrail from a punitive

26

damages award. This grossly one-sided presentation denied Conrail any due process or fundamental fairness in this trial.

{¶ 104} For the reasons above, I believe that the verdict was sorely tainted. I would reverse and remand on the evidentiary and excessiveness issues for a full and fair retrial.

————————————