OPINION
Defendant-Appellant General Motors Corporation (hereinafter "GM") appeals the trial court's September 2, 1999, judgment entry ordering GM to pay Plaintiff-Appellee Frank Bardonaro $100,000 in punitive damages, and the court's subsequent denial of GM's motion for judgment notwithstanding the verdict, a new trial, and/or remittitur. In three assignments of error, GM claims the trial court erred by (1) failing to submit a requested self-defense interrogatory to the jury; (2) failing to find that the evidence adduced at trial was insufficient to support the jury's finding that GM ratified the criminal and injurious acts of its employee; and (3) failing to grant GM's motion for remittitur. After careful consideration, however, we affirm the judgment of the trial court.
This case began simply enough. On January 8, 1996, a particularly snowy day in Dayton, Ohio, GM employee Roger Weller was clearing snow near GM's Delphi Chassis plant in a Bobcat front loader. As Bardonaro approached the stretch of roadway along which Weller was clearing the snow, Weller backed the Bobcat over the snow-covered curb and into the road. Bardonaro swerved to avoid a collision and was successful in doing so. Irritated, he drove his car closer to the Bobcat and attracted Weller's attention. The two men had words, then Weller continued clearing the sidewalk of snow as Bardonaro followed along in his car to see if he could find out where Weller worked. Weller pulled the Bobcat into GM's parking lot and stopped near a guard shack, but left the engine of the machine running and remained inside the operator's compartment.
Meanwhile, Bardonaro parked his car and approached the guard shack intending to get the name of Weller's supervisor. The guard shack was manned by Roy Webster, who assured Bardonaro that he could provide Weller's supervisor's name in fairly short order. Weller, however, opened the door of the Bobcat and shouted to Bardonaro that, among other things, his supervisor's name was none of Bardonaro's "fucking business." At that, Bardonaro took a couple of steps toward Weller, inadvertently stepping into the bucket of the Bobcat. Weller testified at trial that he felt threatened by Bardonaro's conduct and that he was concerned that Bardonaro might have a weapon about him since Weller could not see Bardonaro's hands from inside the Bobcat. Weller's response was to hoist the Bobcat bucket up several inches off the ground while Bardonaro was inside. After Bardonaro lost his balance in the bucket and did not jump out of it, Weller raised the bucket five to seven feet off the ground and began to shake the bucket back and forth. Finally, Weller drove the Bobcat to a nearby snow bank and dumped Bardonaro out of the bucket onto the snow. Bardonaro suffered a broken wrist and other injuries as a result of Weller's treatment of him, and Weller was subsequently given a verbal reprimand by his supervisor at GM and convicted of misdemeanor assault in the Dayton Municipal Court, Criminal Division, for his part in the incident.
About one month after the incident, Weller filed a grievance against GM with his union claiming that GM had failed to provide him with a safe and secure working environment and sought to recover from GM the legal expenses he incurred in defending against the criminal charge. Coincidentally, union employees of the GM Delphi Chassis plant went on strike during the pendency of Weller's grievance and, although the grievance was initially denied, Weller was eventually paid $1,500 as part of the strike settlement, according to GM, which required all outstanding grievances to be settled prior to the union employees' return to work.
On January 3, 1997, Bardonaro filed a complaint in the Common Pleas Court of Montgomery County alleging, inter alia, that GM had ratified Weller's criminal conduct and asking that GM be made to pay punitive damages.[1] Following a jury trial in August of 1999, GM was found liable for punitive damages in the amount of $100,000, and a judgment for that amount was entered on September 2, 1999. On the 16th of that month, GM filed a motion for judgment notwithstanding the verdict, a new trial, and/or remittitur, which was denied by the trial court on October 20. GM later filed its timely notice of appeal and advances three assignments of error as noted above. We address each in the order presented.
 I.
Pursuant to Ohio Rule of Civil Procedure 49(B), the trial court erred by failing to comply with its mandatory duty to submit GM's proposed self defense interrogatory to the jury, and by failing to grant GM a new trial for the same.
Civ.R. 49(B) imposed on the trial court a mandatory duty to submit GM's properly requested self defense interrogatory to the jury, and the trial court's failure to fulfill that duty prejudiced GM.
Bardonaro's "road rage" made it all the more important for the jury to consider Weller's self defense.
In its first assignment of error, GM claims that once they are requested by a party, a trial court is required to submit interrogatories to the jury and has very little discretion to do otherwise. We note, as we have before, that although the language in Civ.R. 49 relating to a trial court's obligation to submit requested interrogatories to a jury is mandatory, it does not mean that the court must act as a "`mere conduit who must submit all interrogatories counsel may propose.'" Phillips v.Dayton Power Light Co. (1996), 111 Ohio App.3d 433, 440, quoting Ramage v. Central Ohio Emergency Serv., Inc. (1992),64 Ohio St.3d 97, 107 and Ragone v. Vitali Beltrami, Jr., Inc.
(1975), 42 Ohio St.2d 161, 165. Assuming without holding that the trial court's failure to submit the requested interrogatory to the jury was erroneous, however, GM has waived any such error by its own failure to object to exclusion of the interrogatory when given a chance to do so by the trial court. Calmes v.Goodyear Tire Rubber Co. (1991), 61 Ohio St.3d 470, 478;Yackel v. Kay (1994), 95 Ohio App.3d 472, 481; Boewe v. FordMotor Co. (1992), 94 Ohio App.3d 270, 278-79.
GM attempts to avoid this result by pointing out that Civ.R. 51(A) relating to jury instructions contains language expressly stating that a failure to raise an objection to the instructions prior to charging the jury waives the issue on appeal, and that the absence of any such language in Civ.R. 49 should be construed as a rejection of the notion that error relating to interrogatories may be waived in a similar fashion. We are unpersuaded. In addition to the authority to the contrary cited above, it is axiomatic that "[a]n appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." State v. Williams (1977), 51 Ohio St.2d 112, paragraph one of the syllabus, approving and followingState v. Glaros (1960), 170 Ohio St. 471, paragraph one of the syllabus. Having failed to raise the alleged error at the appropriate time in the trial court, GM has waived the issue on appeal.
GM's first assignment of error is overruled.
 II.
The trial court erred by denying GM's motion for judgment notwithstanding the verdict or new trial because, as a matter of law, the evidence at trial was insufficient for the jury to conclude that GM ratified Roger Weller's conduct.
GM's investigation, apology to plaintiff, and reprimand of Weller, coupled with no affirmative statement adopting or approving of his conduct, does not constitute ratification as a matter of law.
GM's conduct is wholly unlike other conduct held to constitute ratification.
In its second assignment of error, GM argues that the evidence produced at trial was insufficient to support the jury's finding that GM had ratified Weller's conduct after the incident, and that consequently the punitive damages against GM were inappropriately awarded to Bardonaro. We disagree.
The law pertaining to the propriety of punitive damages in tort cases was summarized in Fulwiler v. Schneider (1995),104 Ohio App.3d 398, 406-7, as follows:
 R.C. 2315.21(B)(1) provides that punitive damages are recoverable from a defendant if "[t]he actions or omissions of that defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that defendant as principal or master authorized, participated in, * * * or ratified actions or omissions of an agent or servant that so demonstrate[.]" * * * Generally, acts committed within the scope of employment will be authorized, either expressly or impliedly, by the employer. Combs v. Kobacker Stores, Inc. (App. 1953), 65 Ohio Law Abs. 326, 330, 114 N.E.2d 447, 450; Fisher v. Hering
(1948), 88 Ohio App. 107, 110, 44 O.O. 79, 80, 97 N.E.2d 553, 555. In that situation, the doctrine of respondeat superior liability will apply and the plaintiff need not prove ratification to hold the employer liable. The plaintiff need prove ratification only where the employee's actions are outside the scope of employment, see State, ex rel. Riley Constr. Co. v. East Liverpool Bd. Of Edn.
(1967), 10 Ohio St.2d 25, 29, 39 O.O.2d 15, 18, 225 N.E.2d 246, 249; Bernardo v. Anello (1988), 61 Ohio App.3d 453, 459, 573 N.E.2d 126, 129; Fisher, supra at 112, 44 O.O. at 81, 97 N.E.2d at 556-557, and if the employer expressly or impliedly ratifies willful and malicious conduct by an employee, an award of punitive damages is proper. Saberton v. Greenwald (1946), 146 Ohio St. 414, 32 O.O. 454, 66 N.E.2d 224, paragraph three of the syllabus.
* * *
 Even slight acts of ratification will be sufficient to support a claim of punitive damages against an employer. Saberton, supra, 146 Ohio St. at 430, 32 O.O. at 460, 66 N.E.2d at 231; Williams v. Hyatt Legal Serv. (Mar. 14, 1990), Summit App. No. 14235, 1990 WL 28113, unreported.
In the present case, GM kept Weller in its employ, issued him a verbal reprimand as their sole disciplinary action, and later paid Weller $1,500 toward his defense in the criminal case that was brought as a result of Weller's assault on Bardonaro. Bardonaro claims GM's insignificant disciplinary action and its payment of Weller's legal fees constitute ratification of Weller's conduct toward Bardonaro. At trial, Bardonaro presented evidence showing that not all of the grievances outstanding at the time of the strike were settled in the union members' favor. On the other hand, GM stated its discipline of Weller was appropriate given that Weller was a long-time employee of GM and had never been involved in any incidents similar to the one that caused Bardonaro's injury. In addition, GM asserted that Weller's legal fees were paid only to further its effort to settle a labor strike that had crippled the corporation nationwide.
The jury could have believed that Weller's grievance wassettled in connection with the labor strike, but settled inWeller's favor because of an intent on GM's part to ratify Weller's conduct and, as always, "[t]he decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. Thus, we find GM's action subsequent to Weller's assault on Bardonaro, in particular its payment of Weller's legal fees, is sufficient to support the jury's finding that GM ratified Weller's conduct. That GM disciplined Weller, albeit lightly, does not necessarily negate the inference of ratification drawn by the jury from GM's payment of Weller's legal fees.
For the foregoing reasons, GM's second assignment of error is overruled.
 III.
The trial court erred by denying GM's motion for remittitur or new trial because as a matter of law, the punitive damage award against GM was excessive.
GM's conduct was not reprehensible.
The punitive damages awarded against GM bear no reasonable relationship to plaintiffs' [sic] actual harm or to other penalties for similar conduct.
In its third and final assignment of error, GM contends the punitive damages it has been ordered to pay to Bardonaro are excessive because they are disproportionate to the compensatory and punitive damages Weller was ordered to pay and because GM's conduct in the whole affair was less than reprehensible. Interspersed with those arguments is GM's contention that it was unfairly assessed punitive damages because it did not have fair notice that it could be subject to such an excessive award. Consequently, GM argues, the trial court erred in denying its motion for remittitur or, in the alternative, a new trial.
"[G]enerally, the amount of punitive damages to be awarded rests largely within the determination of the trier of fact."Villella v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 40. In addition, "the trial judge is in the best position to determine whether an award is so excessive as to be deemed a product of passion or prejudice." Id. Neither the trial court nor the appellate court may substitute its judgment for that of the trier of fact respecting punitive damages. Wightman v. ConsolidatedRail Corp. (1999), 86 Ohio St.3d 431, 438, citing Villella, supra
at 40. .
We first address GM's argument that the punitive damages figure, $100,000, is excessive because it is disproportionate to the compensatory and punitive damages assessed against Weller. GM correctly notes that the punitive damages it was ordered to pay were ten times the amount of punitive damages assessed against Weller and nearly as many times greater than the compensatory damages awarded to Bardonaro. We are not convinced that such a ratio necessarily requires a conclusion that the punitive damages award against GM is excessive.
In support of its argument, GM cites and places primary emphasis on the United States Supreme Court's observation that an award of punitive damages more than quadruple the actual damages might be "close to the line" of constitutional impropriety. SeePacific Mutual Life Ins. Co. v. Haslip (1991), 499 U.S. 1, 23-24. GM extrapolates that if quadruple punitive damages are "close to the line," then an award ten times the compensatory damages is unquestionably beyond the pale of propriety. Missing from GM's argument, however, is recognition of the Court's later affirmance of a punitive damages award that was 526 times the amount of the actual damages awarded. See TXO Production Corp. v. AllianceResources Corp. (1993), 509 U.S. 443. Nor does GM acknowledge the Ohio Supreme Court's recent rejection of an excessiveness challenge to a punitive damages award that was 5,250 times greater than the compensatory award. Wightman, supra. Thus, it can safely be concluded that the United States Supreme Court's statement in Haslip does not have the across-the-board application that GM would have us believe.
Moreover, evaluating the ratio of punitive damages to the harm inflicted on Bardonaro includes consideration of the harmlikely to result from GM's conduct as well as the harm that actually occurred. Wightman, supra at 440-41. Though Bardonaro suffered moderate injuries, the potential for more serious and permanent harm in this case was great. That potential is magnified by GM's message to its employees, via ratification of Weller's conduct, that the use of heavy equipment as a weapon will not be severely punished and that, to the contrary, GM will assist employees engaged in such misconduct in their defense to criminal charges. Therefore, we cannot agree with GM that the ratio of punitive damages to actual damages compels a conclusion that the damages assessed against it are excessive or disproportionate. See BMW of North America, Inc. v. Gore (1996), 517 U.S. 559,582-83; TXO, supra at 459-60; Wightman, supra at 438-39.
GM also argues that the punitive damages award against it was unreasonable because its acts following the incident between Weller and Bardonaro did not amount to reprehensible conduct. Reprehensibility of an actor's conduct has been called "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." BMW, supra at 575; Wightman, supra at 440.
GM attempts to analogize its conduct with that of the automobile company in BMW, supra, by noting that neither it nor BMW had made any false statements, committed any acts of affirmative misconduct, or concealed evidence. GM did, however, ratify its employee's criminal conduct against a third person by paying a portion of his criminal defense attorney's fees. Furthermore, in BMW the Court noted that the harm inflicted on the plaintiff was purely economic in nature, whereas Bardonaro suffered temporary but significant physical injuries. We do not find GM's act of ratifying its employee's injury-causing criminal conduct to be of the same type as BMW's failure to disclose to a car buyer that a scratch on the vehicle had been repainted.
The flaw in GM's argument regarding the reprehensibility of its conduct, however, flows from its narrow vision of what conduct actually precipitated the punitive damages award. GM states that it "apologized for Weller's conduct, investigated and disciplined Weller, and never said it approved of Weller's actions. Such conduct is not "reprehensible." Appellant's Brief at 24. In addition, GM claims that even if it did ratify Weller's conduct, ratification is not an act that is reprehensible. By ratifying an employee's conduct, however, an employer adopts the employee's conduct as its own. In other words, "[t]he essence of `ratification' by [a] principal of [the] act of [its] agent is [a] manifestation by [the] principal to affirm the act * * *." Black's Law Dictionary (6 Ed.Rev. 1990) 1262. Therefore, the question is not whether ratification itself is a reprehensible act, but whether the conduct ratified was reprehensible. Here, it was. Weller lifted Bardonaro up in a piece of heavy machinery that is unquestionably an extremely dangerous piece of equipment, shook Bardonaro back and forth after he had lost his balance, and dumped him out onto a pile of snow. Thus, we have little trouble concluding that GM's ratification as its own of Weller's acts against Bardonaro was reprehensible.
GM's arguments that its conduct would not even warrant a civil penalty, and that ratification is not a criminal act, similarly misapprehend the effect of GM's ratification of Weller's conduct. For that reason, those arguments, too, are unavailing.
Finally, GM contends it was not given fair notice that it could be held liable for $100,000 in punitive damages. In Paragraph Eight of his complaint, however, Bardonaro specifically alleged GM had ratified Weller's conduct and asked that GM be subject to punitive damages. Moreover, in his prayer for relief, Bardonaro sought punitive damages against GM in the amount of $1,000,000. Thus, GM's claim that it was without notice that it could be held liable for $100,000 in punitive damages is without merit.
GM's third assignment of error is overruled.
Having overruled all of GM's three assignments of error, we affirm the judgment of the trial court, and its denial of GM's motion for a judgment notwithstanding the verdict, a new trial, or remittitur.
 ____________________________ FREDERICK N. YOUNG, J.
[1] Although several parties were involved at the trial stage, only GM has appealed and our recitation of the procedural history and substantive issues will, for simplicity's sake, be confined to those that relate to GM's appeal.