OPINION
This appeal has been reopened pursuant to App.R. 26(B). Defendant-appellant John Jenkins, appealing from his conviction and sentence on two counts of Rape and one count of Gross Sexual Imposition, contends that his trial counsel was ineffective for having failed to object to the prosecutor's statement, during closing argument, that:
 "Your job as jurors is not to look for doubt. It's not to give him the benefit of the doubt. Your job is to determine what the truth is. That's what your job is." Jenkins also contends that the trial court erred by overruling his objection to testimony by an expert, Ralph Hicks, that physical evidence of child sexual abuse is found in only 15% of the cases in which child sexual abuse is alleged.
Although we agree with Jenkins that his trial counsel should have objected to the prosecutor's mis-statement, during closing argument, concerning the jury's role, we conclude that the failure to object to this isolated remark did not so undermine the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result, which is required by Strickland v. Washington
(1984), 466 U.S. 668, for reversal of a criminal conviction based upon the ineffective assistance of trial counsel.
With respect to the expert's testimony, the subject of this testimony that physical evidence of sexual abuse is found in only 15% of cases in which child sexual abuse is alleged was merely background information for the jury, and was not the expression of an opinion or inference requiring a laying of a foundation pursuant to Evid.R. 703. Because we find no reversible error, the judgment of the trial court is Affirmed.
 I
In 2000, Jenkins was charged with five counts of Rape, two counts of Sexual Battery, and two counts of Gross Sexual Imposition. The alleged offenses involved his stepdaughters, P.G., and E.E. At trial, E.E. testified. P.G. was then called to testify, but was unable to complete her direct examination. The State dismissed all of the charges pertaining to her, and the jury was ultimately instructed to disregard her testimony. Of the four remaining counts, the jury found Jenkins guilty of two counts of Rape and one count of Gross Sexual Imposition, but acquitted him of one count of Rape.
From his conviction and sentence, Jenkins appealed. We affirmed.State v. Jenkins (July 27, 2001), Miami App. No. 2000-CA-59.
Jenkins moved to reopen his appeal pursuant to App.R. 26(B), contending that his appellate counsel had been ineffective for having failed to assert two assignments of error. In a decision entered December 21, 2001, we granted his motion to re-open his appeal.
 II
Jenkins' First Assignment of Error is as follows:
 "TRIAL COUNSEL'S FAILURE TO OBJECT TO THE STATE'S EGREGIOUS MISSTATEMENT OF THE BURDEN OF PROOF DURING ITS CLOSING ARGUMENT DEPRIVED MR. JENKINS THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION."
This was a one-on-one Rape and Gross Sexual Imposition case. There was no physical evidence. Jenkins rested without presenting evidence, so the essential issue was whether the testimony of the complaining witness was credible. During the prosecutor's initial argument, he made no reference to the burden of proof. He told the jury that they must decide whether to believe the complaining witness.
Jenkins' counsel then made his closing argument. As might be imagined, defense counsel stressed the burden of proof beyond reasonable doubt. During the course of his argument, the following exchange occurred:
 "The fact that [E.E.] came in and said these horrible things about John Jenkins didn't surprise me. I expected it and it happened. But the fact that it happened doesn't make it true. It has to be proven. And when Mr. Bennett advises that if you believe her that's all you have to do that's somewhat true but it's not entirely true.
"MR. BENNETT: Objection. That is true.
 "MR. LAYMAN: You have to believer [sic] her beyond a reasonable doubt.
 "THE COURT: Arguments of Counsel are not evidence, ladies and gentlemen.
 "MR. LAYMAN: You have to believe that her testimony was believable beyond a reasonable doubt. It has to remove all reasonable doubt from your head before you can rely solely upon that. If there's still doubt, reasonable doubt, after considering her testimony then your verdict must be not guilty. So keep that in mind. Keep that in mind."
The prosecutor's final closing argument included the following:
 "Now we talked in voir dire about kids lying. We all know kids lie. We lied when we were kids. But we talked about why kids lie. Kids lie to get out of trouble. Kids lie so they won't be punished. Kids won't lie in order to get punished. So what's her motive. Nobody come [sic] up with one. Why is that. There isn't any. This little girl is absolutely petrified [sic] of this guy so she doesn't tell. This little girl and we make her go through all criminal justice system, we make her come in here, we make her testify and we make her tell you all this stuff, right. We do all that because she's believed by some people.
 "So Mr. Layman says, hey, you gotta believe her beyond a reasonable doubt and that's true. Your job as jurors is not to look for doubt. It's not to give him the benefit of the doubt. Your job is to determine what the truth is. That's what your job is. Your job is to determine what happened here. That's what's fair. That's what's fair to him. That's what's fair to [E.E.]. You know she doesn't have a right to vote, she doesn't have the right to choose where she goes to school, what she eats for dinner every night, she didn't have those rights but she does have the right to be believed cause [sic] that's the way our system works. She has the right to be believed.
 "Judge Lindeman's gonna tell you in a few minutes when you make a reasonable doubt determination use your common sense. All right. As we all know Abe Lincoln says, the jury is the common sense voice of the common people. So I'm asking you, do you think she sat out and made all this up because she didn't know how many times it was. You know what, if she would have come in here and said it happened fifteen times, oral sex, it happened three times on digital, it happened two times on vase, and it happened on this date and it happened between this time, Mr. Layman would have been up here arguing that we told her what to say, that she'd been coached. So what he's asking you to do is hold her to a higher standard than we would hold anyone else. Now is that fair. Absolutely not. Because she's a child and she didn't tell it exactly the way she told Pat months ago she's unbelievable. Come on."Your job is to seek the truth and if you think Ralph Hicks is full of it and if you think she's lying, if you think Pat Brown doesn't know what he's doing, that grandma's such a terrible person, then find him not guilty. All I'm saying is she has a right to her day in Court too. She has the right to be believed. And that's up to you to decide whether or not you believe her. But the truth is she didn't lie to you. Pat Brown didn't lie to you. You've gotta look here folks. Who's got the most to lose. It certainly isn't [E.E.]. Thank you very much."
In its instructions to the jury, the trial court included standard instructions concerning the burden of proof:
 "Burden of proof. The defendant is presumed innocent until his guilt is established beyond a reasonable doubt. A defendant must be acquitted of a particular offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of that offense charged in the indictment.
 "What's reason [sic] doubt. Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.
"* * *
 "If you find the State proved beyond a reasonable doubt all the essential elements of any one or more of the separate counts of Rape as charged in the indictment, your verdict must be guilty as to such offense or offenses, according to your findings.
 "If you find the State failed to prove beyond a reasonable doubt any one of the essential elements of any one or more of the separate counts of Rape as charged in the indictment, then your verdict must be not guilty as to such offense or offenses according to your findings."
The trial court gave a similar instruction with respect to the charge of Gross Sexual Imposition. When the trial court instructed the jury concerning the verdict forms, it told the jury, "And you go down here where the asterisk and it says insert in ink, guilty or not guilty, and of course it has to be beyond a reasonable doubt, whatever your findings would be and it has to be unanimous, all twelve of you, you would then fill in that blank line with either one of those two findings,. . . ."
During deliberations, the jury indicated to the trial court, through its foreperson, that although it had reached a verdict on one of the four charges, it was divided on the other three charges. The trial court then gave an additional instruction pursuant to State v. Howard (1989),42 Ohio St.3d 18. In this instruction also, the concept of reasonable doubt was alluded to: "If there is a disagreement all jurors should re-examine their positions given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubts are reasonable considering that it is not shared by others, equally honest, who have heard the same evidence with the same desire to arrive at the truth and under the same oath. Likewise jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of the judgment not concurred in by all other jurors."
Unquestionably, the prosecutor ought not to have told the jury that it was not their job to give the defendant the benefit of the doubt. It was precisely the duty of the jury to give the defendant the benefit of reasonable doubt. In its brief, the State argues that "the evidence in this case was overwhelming." We disagree.
In our view, this was a close case. Although there had been complaints of physical abuse at the hands of both parents, both complaining witnesses had denied, for months, to two different investigating officers, that there had been any sexual abuse by Jenkins. It was only after they had been placed in the custody of their maternal grandmother, who had taken a dislike to Jenkins, that the two stepdaughters made assertions of sexual abuse. The older of the two was unable to complete her testimony on direct examination. The record does not indicate the reason for this. The younger stepdaughter did testify, and although her testimony was not inherently incredible, there were some aspects of her testimony that a reasonable jury might find difficult to credit. For example, the complainant testified that Jenkins began playing a pornographic videotape for her just fifteen minutes before her mother was scheduled to get home from work, when she, her sister, and Jenkins had been alone together in the house for several hours before this. As Jenkins notes, it seems unlikely that he would have begun playing a pornographic videotape so soon before his wife, the girls' mother, was due to return from work.
Jenkins cites Strickland v. Washington, supra, for the proposition that: "The benchmark for judging any claim of ineffectiveness [of trial counsel] must be whether counsel's conduct so undermines the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Even though this was, in our view, a close case, we conclude that trial counsel's failure to have objected to the prosecutor's misstatement of the jury's allegations with respect to reasonable doubt did not so undermine the proper functioning of the adversarial process that the trial in this case cannot be relied upon as having produced a just result. We base this conclusion upon the repeated references by defense counsel and the trial court to the burden of proof beyond reasonable doubt. Having reviewed the transcript of this trial, we can understand why the jury had difficulty with this case. Based upon defense counsel's statements concerning the burden of proof beyond reasonable doubt, and, more importantly, the trial court's instructions to the jury, we are convinced that the jury understood its obligation to give Jenkins the benefit of reasonable doubt, notwithstanding the prosecutor's misstatement in that regard. Accordingly, although we agree with Jenkins that his trial counsel's performance fell below an objective standard of reasonableness when his trial counsel failed to object to the prosecutor's misstatement, we are not persuaded that prejudice resulted therefrom.
Jenkins's First Assignment of Error is overruled.
 III
Jenkins's Second Assignment of Error is as follows:
 "THE TRIAL COURT ERRED IN ALLOWING AN EXPERT WITNESS TO OFFER UNSUBSTANTIATED MATHEMATICAL PROBABILITIES TO DISCOUNT THE STATE'S LACK OF PHYSICAL EVIDENCE IN VIOLATION OF EVID. R. 703 AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION."
A medical doctor, Ralph Hicks, testified for the State. He had examined the complaining witnesses, months after the alleged abuse occurred, and found no physical evidence of abuse. Hicks was then asked a series of questions concerning the frequency with which claims of sexual abuse of children are corroborated by physical evidence. Objections to this line of questioning were initially sustained, but the following ultimately transpired:
 "Q. Okay. Well, explain to me what you mean then cause [sic] I'm confused. You said fifteen percent of the time
 "A. What I said was that in children who have been sexually abused the percentage who have abnormal exams or physical findings that are related to sexual abuse or specific findings for sexual abuse is only about fifteen percent or so.
"Q. So eighty-five percent then don't?
"A. Correct.
 "MR. LAYMAN: And again I object, Your Honor. This, the doctor can't testify to that. He doesn't know. He doesn't have a foundation to know. He just knows that his results
 "THE COURT: Yeah, I think he's talking general terms not specifics involving this case.
"MR. BENNETT: Right.
"MR. LAYMAN: I still object.
 "Q. Generally speaking, we're talking generally speaking, fifteen percent you find something?
 "A. I'm referring to what's published in the medical literature.
"Q. I'm sorry?
 "A. I'm referring to what's published in the medical literature.
"Q. Okay.
 "A. If one looks at all children, um, who've been examined or who are examined for sexual abuse.
"Q. Okay. Fifteen percent?
"A. Approximately. Yes.
 "Q. All right. So, um, if the finding is normal and if I can use that word, there's nothing that you're able to say one way or the other does that mean that as a physician you're able to say no it definitely did not happen or yes it did happen?
"A. No.
"Q. Okay. What does it mean?
 "Q. Well it means, I mean the physical exam, the results of the physical examination itself have to be put together with all of the other information related to an individual case.
"Q. Okay.
"A. Including the history.
 "Q. Okay. You didn't take the history though in this case I take it. Destry did?
 "A. Um, not, I did not directly take the history as it relates to the reason for the visit."
Jenkins relies upon Evid.R. 703, which provides as follows:
 "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."
Jenkins cites State v. Robles (1989), 65 Ohio App.3d 104. In that case, an expert on blood and other serological evidence expressed an opinion that blood found at the scene of the crime was not the blood of either the defendant or the co-defendant, but that, based upon a 1982 study of the Federal Bureau of Investigation, it was statistically likely to be the blood of the alleged victim. The court held that Evid.R. 703 requires that an expert witness base his opinion upon either personal knowledge or facts in evidence, and that, because the 1982 FBI study upon which the expert's opinion was based was not in evidence, the trial court erred by having admitted the expert's opinion testimony. In our view, this case is distinguishable.
In the case before us, Hicks did not offer his opinion whether the alleged victims were, or were not, sexually abused. He did testify that he had examined the victims, and that there were no physical findings of sexual abuse. In order to assist the jury in determining whether sexual abuse occurred, Hicks testified that, based upon the medical literature, with which he was familiar, physical evidence of child sexual abuse is only found 15% of the time. This is comparable to the situation inWightman v. Consolidated Rail Corp. (1999), 86 Ohio St.3d 431,1999-Ohio-119, in which an expert had testified concerning statistics involving vehicle train collisions. The court held that: "When providing background information, and not opining as to causation, we cannot expect an expert to footnote every statement with a recitation of his direct observation of the phenomenon, or a bibliography explaining how he knows his statement to be true." Id., at 437.
In the case before us, as in Wightman, supra, the expert was not expressing an opinion, but was merely providing background information, in the area of his expertise, for the benefit of the jury. Consequently, as in Wightman, supra, the foundational requirements of Evid.R. 703 do not apply. If Jenkins wished to test the validity of Hicks' testimony, he was free to cross-examine Hicks concerning the medical literature upon which he based his observation that claims of child sexual abuse are only corroborated by physical evidence about 15% of the time.
Jenkins' Second Assignment of Error is overruled.
 IV
Both of Jenkins's assignments of error having been overruled, the judgment of the trial court is Affirmed.
GRADY and YOUNG, JJ., concur.