[Cite as *Cleveland v. St. Elizabeth Health Ctr.*, 2012-Ohio-1472.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| ANTONIO CLEVELAND,<br>ADMINISTRATOR OF THE ESTATE OF<br>TELINA CLEVELAND, | ) ) ) | |
| | ) | |
| PLAINTIFF-APPELLANT, | ) | CASE NO. 10-MA-151 |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| ST. ELIZABETH HEALTH CENTER, ET<br>AL., | ) ) ) | |
| | ) | |
| DEFENDANTS-APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 08CV1823

JUDGMENT: Reversed and Remanded

APPEARANCES:
For Plaintiff-Appellant
Atty. Christopher M. Mellino
Atty. Michael E. Lyford
200 Public Square, Suite 2900
Cleveland, Ohio 44114

For Defendants-Appellees
Atty. Matthew G. Vansuch
Atty. Shirley J. Christian
2235 E. Pershing St., Suite A
Salem, Ohio 44460

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: March 28, 2012

DONOFRIO, J.

{¶1} Plaintiff-appellant, Antonio Cleveland, the Administrator of the Estate of Telina Cleveland, appeals from a Mahoning County Common Pleas Court judgment in favor of defendants-appellees, Dr. B. David Collier and Ohio Imaging Associates, Inc., on appellant's medical malpractice claim.

{¶2} On November 13, 2007, 40-year-old Telina Cleveland went to the emergency department at St. Elizabeth Health Center with severe pain in her left leg. She reported to the emergency room doctor that the pain was in her left calf. Telina was sent to the radiology department for an ultrasound of her leg. An ultrasound technician performed the ultrasound examination. The ultrasound did not include Telina's calf. The ultrasound images were then given to Dr. Collier, the on-duty radiologist, for interpretation. He reported that there was no deep vein thrombosis (DVT) in Telina's leg. Telina was discharged from the hospital with a diagnosis of leg cramps.

{¶3} Two days later, Telina suffered a fatal pulmonary embolism. An autopsy revealed extensive thrombus in the deep veins of Telina's left leg, some of which had broken off, travelled to her lungs, and caused the pulmonary embolism that resulted in her death.

{¶4} Appellant filed a complaint on April 30, 2008, against appellees, St. Elizabeth, and several other defendants alleging medical malpractice that resulted in Telina's death. Dr. Collier is employed by Ohio Imaging Associates, Inc.

{¶5} The case proceeded to a jury trial against appellees and St. Elizabeth. During the course of the trial, appellant reached a settlement with St. Elizabeth. The jury then returned a verdict in favor of appellees. Appellant filed a motion for new trial, which the trial court denied.

{¶6} Appellant filed a timely notice of appeal on September 21, 2010.

{¶7} Appellant raises two assignments of error, the first of which states:

{¶8} "THE MANIFEST WEIGHT OF THE EVIDENCE AT TRIAL SHOWED DEFENDANT-APPELLEE B. DAVID COLLIER, M.D. WAS NEGLIGENT."

{¶9} Appellant argues here that the evidence clearly established that Dr. Collier was negligent. He contends that Dr. Collier's own expert testified that he was negligent for not knowing the hospital's protocol regarding DVT ultrasound examinations. He further contends that the evidence was uncontroverted that Dr. Collier was responsible for supervising ultrasound technicians, that the ultrasound technician did not follow the hospital's DVT ultrasound protocol, and that the ultrasound technician did not perform a complete ultrasound examination of Telina's leg.

{¶10} Appellant goes on to argue that the trial court erred in denying his motion for a new trial because competent, credible evidence did not exist to support the verdict. The only evidence to support the verdict, appellant argues, was Dr. Collier's own self-serving testimony.

{¶11} Judgments supported by some competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence. *C .E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus (1978). See, also, *Gerijo, Inc. v. Fairfield*, 70 Ohio St.3d 223, 226, 638 N.E.2d 533 (1994). Reviewing courts must oblige every reasonable presumption in favor of the lower court's judgment and finding of facts. *Gerijo*, 70 Ohio St.3d at 226, (citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77 [1984]). In the event the evidence is susceptible to more than one interpretation, we must construe it consistently with the lower court's judgment. *Id.* In addition, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *Kalain v. Smith*, 25 Ohio St.3d 157, 162, 495 N.E.2d 572 (1986).

{¶12} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or

surgeon would have done under like or similar conditions and circumstances, and that injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673, paragraph one of the syllabus (1976).

{¶13} We must examine the evidence presented to determine if it supports the jury's verdict.

{¶14} Dr. Collier was appellant's first witness. Dr. Collier admitted that he was previously convicted of making materially false statements to a federal investigator. (Tr. 76). Dr. Collier testified that he had no recollection of the day in question, of interpreting the images at issue, of reviewing the scan, or of discussing the study with Tracy Melfi, the ultrasound technician who performed the scan. (Tr. 48-49). He further testified that at the time of Telina's ultrasound, he was not aware that the hospital had a protocol for ruling out DVT. (Tr. 49-50). One of the four rules in the hospital protocol is to examine the area of pain to rule out thrombus or fluid collection.

{¶15} Dr. Collier stated that as a radiologist, he does not see the patient when an ultrasound is performed. (Tr. 55). However, the ultrasound technician works under his supervision. (Tr. 55). He stated that his job is to review the images taken by the technician to make sure that the study is of good technical quality, to see that it is a complete examination, and to look for DVT. (Tr. 60). Dr. Collier stated that although the technician records her opinion, he performs his own review of the images and reaches his own conclusion. (Tr. 63). He testified that it was his job to make sure that Telina did not have a blood clot. (Tr. 66).

{¶16} Dr. Collier testified that at the time of reviewing the scan, the information he had was that the emergency room doctor was looking for a DVT in the left leg and the patient had symptoms of DVT. (Tr. 58). He stated that had he known Telina had complained of calf pain, he would have instructed Melfi to scan Telina's leg below her knee, including the calf veins. (Tr. 77). However, he had no knowledge at the time of the scan that Telina had complained of calf pain. (Tr. 78).

And Dr. Collier acknowledged that if Telina had a clot in her lower leg, and an ultrasound was done only of her upper leg, the clot would go unnoticed. (Tr. 85).

{¶17} Dr. Collier acknowledged that the autopsy report stated that Telina had a blood clot in the popliteal vein. (Tr. 80). He stated, however, that he examined Telina's popliteal vein on November 13, 2007, and it was normal. (Tr. 80). But he did not examine her calf. (Tr. 81).

{¶18} Dr. Collier testified that Telina's scan was complete and was not required to go below her knee. (Tr. 74). He disagreed that in order to rule out DVT in all cases the entire leg must be scanned. (Tr. 75).

{¶19} Dr. David Jackson was the emergency room doctor who examined Telina and ordered her ultrasound. Dr. Jackson testified that upon arriving at the hospital, Telina was first seen by the triage nurse, then by the physician's assistant, and then by him. (Tr. 98). Telina reported that she had pain in her left calf for several days. (Tr. 96). Dr. Jackson stated that in response to his concern that Telina might have DVT, he ordered an ultrasound from radiology of her left leg. (Tr. 103, 105). The order sheet indicated an ultrasound of the lower, left extremity, to rule out DVT. (Tr. 106). Dr. Jackson expected that the ultrasound would be of Telina's entire leg, including her calf. (Tr. 108, 112).

{¶20} Dr. Jackson stated that if an ultrasound is positive for DVT, the patient is admitted and treated with anticoagulants. (Tr. 109). Specifically, Dr. Jackson testified that he would not have discharged Telina if he had known there were blood clots in her leg. (Tr. 109). Instead, he would have immediately given her Heparin. (Tr. 111). But he relied on the ultrasound report from Dr. Collier and discharged Telina. (Tr. 111). Dr. Jackson did not know that the ultrasound was not done on Telina's calf. (Tr. 111). Had he known this, he would not have discharged her because the ultrasound was inadequate to rule out DVT. (Tr. 111, 112, 140). Dr. Jackson testified that 90 percent of DVTs originate in the calf. (Tr. 111).

{¶21} Tracy Melfi was the ultrasound technician who performed Telina's ultrasound. Melfi had no memory of Telina or of performing Telina's ultrasound

examination. (Tr. 151). Melfi testified regarding the hospital's four rules for ultrasounds to rule out DVT. (Tr. 153). The first rule is to do a compression study of the veins every centimeter along the vein. (Tr. 154). Melfi stated that she took all 19 pictures in color, as opposed to gray scale, because she was unable to see the vein without the color. (Tr. 156). Melfi referred to the pictures she took of the four veins in Telina's leg. She stated that three veins appeared straight, but the popliteal vein appeared "torturous." (Tr. 160-61). However, she stated that this was not abnormal and that there was no blood flow missing in the popliteal vein. (Tr. 161).

**{¶22}** Melfi stated that she did not examine Telina's leg below the knee. (Tr. 162). She stated that the popliteal vein ends right behind the knee and her exam ended with the end of the popliteal vein. (Tr. 162-63). She did not examine the veins in Telina's calf. (Tr. 168). Melfi acknowledged that hospital rule number four requires that an ultrasound always be performed over the area of pain. (Tr. 169). However, she stated that she was unaware of Telina's calf pain. (Tr. 170). Melfi stated that the requisition she received indicated "limb pain." (Tr. 170). And while she acknowledged that the calf is part of the limb, Melfi testified that she was taught to stop the examination at the end of the popliteal vein when there is no complaint of calf pain. (Tr. 170). Melfi stated that had Telina told her that she had calf pain, Melfi would have scanned her calf too. (Tr. 171). But she admitted that she had no recollection of what Telina may have told her or if she asked Telina if she had calf pain. (Tr. 171-73).

**{¶23}** Melfi also acknowledged that she had access to a sheet from the triage nurse indicating that Telina had pain in her calf muscle. (Tr. 174-75). In fact, Melfi even wrote her own notes on the same sheet. (Tr. 176). However, Melfi stated that she is not required to go through the medical history or the emergency room documents. (Tr. 176). She said that the only thing she was required to do was to check the order and indicate that the exam was done. (Tr. 176).

**{¶24}** Dr. Paul Collier (Dr. Paul) is a vascular surgeon and appellant's expert witness. Dr. Paul first read from the coroner's findings. The coroner found Telina's

cause of death was a pulmonary embolism. (Tr. 191). The source of the embolism was a DVT in the left leg in the popliteal region. (Tr. 192). Dr. Paul stated that this was near the knee. (Tr. 192). Dr. Paul opined that the clots that were found in Telina's leg during her autopsy were present when she was in the hospital on November 13, 2007. (Tr. 192). He stated that the ultrasound did not go down far enough. (Tr. 193). Dr. Paul further noted that in the emergency room, Telina complained of pain and swelling in her calf. (Tr. 193-94). Furthermore, on the ultrasound, Dr. Paul stated that there was a "marked irregularity" of the vein's wall making it appear more likely that there was a clot lining the wall. (Tr. 194). He opined that the irregularity was likely the tip of the iceberg, or a partially occlusive clot with more "downstream." (Tr. 194). Dr. Paul also opined that the image of Telina's popliteal vein showed an irregularity where it appeared "squiggly and all ratty." (Tr. 214). He stated that it should look the same as the other three veins. (Tr. 218).

**{¶25}** Dr. Paul further testified that, in his opinion, Dr. Collier breached the standard of care required by a doctor who is reading and interpreting an ultrasound. (Tr. 216-17). As a basis for his opinion, Dr. Paul stated that Dr. Collier accepted an inadequate study and misinterpreted the study where there was an abnormality that was not explained. (Tr. 217). He stated that the study was not complete because Telina complained of calf pain and her calf was not scanned. (Tr. 216). He also stated that the vein compression was not done properly because there appeared to be a partially occluding clot in the popliteal vein. (Tr. 216, 219). In conclusion, he opined that Dr. Collier's failure to meet the standard of care was a proximate cause of Telina's pain and suffering and death. (Tr. 223). Dr. Paul testified that had the study been performed properly and interpreted properly, the clot would have been diagnosed in time to treat Telina and prevent her death. (Tr. 223).

**{¶26}** As to how the compression study was done incorrectly, Dr. Paul stated that the compressions should have been done in black and white images so one would be able to tell where the vein walls collapsed. (Tr. 241). He stated that with the color images used, the color fills the walls of the vein and can almost bleed

through so that you do not get a clear picture of the wall. (Tr. 290). He further opined that the area on the popliteal vein that looked like a "shark bite" was most likely a clot and that the study should have been repeated to confirm this. (Tr. 247-48).

**{¶27}** Dr. John Cronan is a diagnostic radiologist and appellees' expert. Dr. Cronan testified that one can view compressed veins in color or in black and white. (Tr. 366). He stated that when using color, you simply look for the color to go away when the vein is compressed. (Tr. 366, 369). Contrary to Dr. Paul's opinion, Dr. Cronan opined that the "puckering" in Telina's popliteal vein was not a clot. (Tr. 375). Dr. Paul also opined that Telina's ultrasound study was a complete and normal exam. (Tr. 379, 384-85). He saw no evidence of a clot. (Tr. 383).

**{¶28}** As to how Telina had a pulmonary embolism two days after her "normal" ultrasound, Dr. Cronan did not have a definitive explanation. (Tr. 379). He stated that this type of occurrence happens and that only about 30 to 40 percent of people who have a clot in their lungs have clots in their legs too. (Tr. 380). Additionally, Dr. Cronan stated that the ultrasound study is 95 percent accurate in finding clots in the legs, meaning that five percent of clots go undetected by the ultrasound. (Tr. 381).

**{¶29}** On cross examination, Dr. Cronan stated that if the patient has calf pain, the calf should be evaluated. (Tr. 395). He stated that in cases where there is no complaint of calf pain, a complete exam includes the popliteal vein down to the point of bifurcation. (Tr. 397). But in cases where there is a complaint of calf pain, a complete exam includes the popliteal vein plus two calf veins. (Tr. 397-98, 416). Dr. Cronan agreed that without doing a complete scan, DVT cannot be ruled out. (Tr. 398).

**{¶30}** Dr. Cronan further testified that he assumed Dr. Collier knew the hospital's protocol. (Tr. 411). He stated that if Dr. Collier did not know the hospital's protocol for venous ultrasounds, this was below the standard of care. (Tr. 412).

However, he stated that because Dr. Collier's requisition form stated "leg pain," an exam that stopped at the end of the popliteal vein was a complete exam. (Tr. 415).

**{¶31}** Finally, Dr. Collier testified in his defense as an expert witness. Dr. Collier testified that at the time he reviewed Telina's studies, he had no clinical history that she had calf pain. (Tr. 427). He stated that if he had been told that Telina had pain in her calf, he would have scanned her calf. (Tr. 428, 457). Dr. Collier further testified that the scan of Telina's popliteal vein was normal. (Tr. 435). Dr. Collier stated that he saw no evidence of a clot and was unsure what Dr. Paul was referencing when he testified that there was a "shark bite" indicative of a clot. (Tr. 436). Dr. Collier testified, based on his knowledge, education, training, and experience, that Telina's study did not show a clot. (Tr. 438).

**{¶32}** Dr. Collier further testified that at the time of Telina's ultrasound, he was not aware of the hospital protocol requiring him to scan the area of the pain. (Tr. 440). However, he followed hospital policy when he read Telina's ultrasound. (Tr. 440). In other words, although he was not aware of the protocol, he followed it without knowing that he was following it. (Tr. 440). And although Dr. Collier had no memory of Telina or her ultrasound, he testified that he was not advised that she had pain below her knee. (Tr. 441). He stated that he knew this because if he had been advised that Telina had calf pain, he would have ordered Melfi to scan Telina's calf. (Tr. 441-42). However, he also acknowledged that he was aware that Telina had "limb" pain and "leg" pain although he did not know where in her leg the pain was located. (Tr. 458). Dr. Collier stated that when a patient has calf pain, the reports he gets from the technician and the emergency room specifically state that the patient has "calf" pain. (Tr. 464-65).

**{¶33}** The evidence presented makes this a very close case. There was substantial, credible evidence weighing on both sides. On one hand, Dr. Paul's testimony was that Dr. Collier breached the standard of care in failing to do a complete ultrasound that included Telina's calf and in failing to identify an area on her popliteal vein that he opined was likely a clot. On the other hand, Dr. Cronan's and

Dr. Collier's testimony was that Dr. Collier did not breach the standard of care because he reviewed a complete ultrasound given that he was unaware of Telina's calf pain and that the area Dr. Paul opined was a possible clot was actually a normal part of Telina's popliteal vein.

{¶34} In this case, someone was clearly negligent. However, the jury could have found that the hospital was the negligent party and not Dr. Collier. St. Elizabeth was also a defendant in this case. During the trial, St. Elizabeth settled with appellant. It is possible the jury concluded that the negligence here was that Dr. Collier was never made aware of Telina's complaint of calf pain. Telina told the emergency room doctor, Dr. Jackson, that she had pain in her calf. However, it is possible, based on Dr. Collier's testimony, that he was never made aware of the calf pain. Dr. Collier testified that if he had known that Telina had calf pain, he would have instructed Melfi to scan Telina's calf. And Melfi testified that if Telina had told her she was experiencing calf pain, she would have scanned Telina's calf. Furthermore, based on Dr. Collier's and Dr. Cronan's testimony, if Dr. Collier was not specifically made aware of calf pain, it was proper procedure to stop the scan of Telina's leg at the end of her popliteal vein, or right below her knee.

{¶35} Given that there is some competent, credible evidence in support of the jury's verdict, we cannot conclude that their verdict was against the manifest weight of the evidence. Accordingly, appellant's first assignment of error is without merit.

{¶36} Appellant's second assignment of error states:

{¶37} "THE TRIAL COURT ERRED BY NOT ALLOWING PLAINTIFF-APPELLANT TO IMPEACH THE CREDIBILITY OF THE ONLY EXPERT TO CREATE A QUESTION OF FACT AS TO NEGLIGENCE WITH EVIDENCE SHOWING SEVERAL STATES HAD REVOKED HIS MEDICAL LICENSE AND WITH EVIDENCE SHOWING THE CIRCUMSTANCES SURROUNDING HIS CRIMINAL CONVICTION FOR LYING ABOUT HIS MEDICAL PRACTICE."

{¶38} Dr. Collier filed a motion in limine seeking to prevent appellant from referring to (1) his prior felony conviction for making false statements and

representations to the United States Department of Health and Human Services and (2) the suspension of his medical license by the California and Wisconsin medical boards.

{¶39} The factual basis underlying these actions occurred while Dr. Collier was employed at the Medical College of Wisconsin. The allegation was that Dr. Collier falsely stated and represented to officials from the Department of Health and Human Services that he had personally signed all medical reports bearing his name that purported to reflect his view and interpretation of nuclear medicine scans when, in fact, a visiting professor whose temporary medical license had expired had actually performed a substantial portion of the reviews and interpretations at issue and had signed the reports using Dr. Collier's name. However, Dr. Collier asserted that he reviewed and interpreted all nuclear medical studies signed by the other individual using his name. Dr. Collier was convicted of misleading investigators about a practice regarding the signing of the reports. He was not convicted of failing to interpret his own studies.

{¶40} The trial court granted Dr. Collier's motion in part. It ruled that appellant could use Dr. Collier's conviction only for the purpose of credibility and veracity. It ruled that appellant could not use the alleged facts behind the conviction as an act similar to the doctor's actions in this case. It also ruled that appellant could not introduce the suspensions of Dr. Collier's medical license.

{¶41} The decision to admit or exclude evidence rests in the trial court's sound discretion and we will not reverse its decision absent an abuse of that discretion. *Wightman v. Consolidated Rail Corp.*, 86 Ohio St.3d 431, 437, 715 N.E.2d 546 (1999). Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶42} Appellant first argues that the circumstances surrounding Dr. Collier's prior conviction and license revocation so closely track the situation in this case that the jury could not have meaningfully judged Dr. Collier's credibility without hearing

more about those circumstances. He contends that the simple statement that Dr. Collier had a conviction for making false statements and representations to the U.S. Department of Health and Human Services meant nothing to the jury and offered no real insight into Dr. Collier's credibility.

{¶43} Appellant further argues that the court should have allowed him to cross examine Dr. Collier regarding the circumstances surrounding his criminal conviction. He contends that Dr. Collier told lies directly related to his medical practice in a misplaced effort to protect his license and career. In this case too, appellant asserts, Dr. Collier's professional conduct was once again at issue. Thus, he contends the circumstances regarding Dr. Collier's prior conviction went directly to Dr. Collier's credibility.

{¶44} In 1999, Dr. Collier pleaded guilty to and was convicted of "making false statements and representations to the U.S. Department of Health and Human Services." (Motion in Limine, Ex. A). Appellant's conviction was for falsely representing to federal investigators that he personally signed all medical reports bearing his name. (Motion in Limine, Ex. A). However, Dr. Collier steadfastly maintained that he personally reviewed and interpreted all nuclear medicine studies signed by the other individual using Dr. Collier's name. (Motion in Limine, Ex. A).

{¶45} Pursuant to Evid.R. 609(A)(3): "evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance." Thus, the evidence of Dr. Collier's conviction was clearly admissible. But the Rule does not provide for admitting the factual allegations surrounding a conviction. Furthermore, the "facts" that appellant sought to introduce were never substantiated but were only the allegations of the federal agents who investigated Dr. Collier.

{¶46} Thus, the trial court did not abuse its discretion in disallowing cross examination regarding the underlying facts of Dr. Collier's criminal conviction.

**{¶47}** Second, appellant contends courts have repeatedly permitted cross examination as to the revocation of a professional license. He asserts that when evidence of a professional license has been introduced on direct examination, evidence that the witness's license has been revoked is relevant to the issue of credibility. Appellant points out that Dr. Collier testified as an expert in his defense. He argues that by doing so, Dr. Collier put his professional credentials at issue and also made them a proper issue to rebut.

**{¶48}** Evid.R. 601(D) requires a person giving expert medical testimony in a medical malpractice case to be licensed. Additionally, a witness may testify as an expert if, in addition to other requirements, he "is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 702(B).

**{¶49}** In this case, Dr. Collier testified as an expert witness in his own defense. Before getting into his testimony regarding Telina's ultrasound, Dr. Collier testified at length regarding his education, experience, and training in the medical field. (Tr. 423-26). In other words, he spent some time building up his credentials in front of the jury so that, presumably, they would give more weight to his medical opinion regarding the ultrasound. Given that Dr. Collier put his professional credentials at issue, the trial court should have allowed appellant to cross examine him with the suspensions of his medical license in Wisconsin and California. Dr. Collier opened the door by testifying to his medical credentials. By not allowing cross examination with the suspensions, Dr. Collier was able to give the jury the impression that his professional credentials were untarnished when this was not the case.

**{¶50}** Courts have found that a physician-witness's licensure is a matter that affects the weight to be given to their testimony. See *Ray v. Ramada Inn N.*, 181 Ohio App.3d 350, 2009-Ohio-1278 ("If the fact that a testifying physician's medical license is suspended at the time of his testimony at trial does not cast sufficient doubt upon its reliability to preclude its admission in a criminal trial, we see no reason to employ a higher sensitivity to a similar doubt concerning its reliability in a civil trial. As

counsel for both parties agreed in oral argument, the fact of Moore's suspended license to practice medicine is a fact that could, and certainly would, be brought up in his cross-examination at trial, should he be permitted to testify."); *State v. Snodgrass*, 177 Ohio App.3d 556, 2008-Ohio-4019 (doctor whose license had been suspended for six months could still testify as an expert but his license suspension was a matter of the weight to be given to his testimony); *In re Webb*, 64 Ohio App.3d 28, 580 N.E.2d 506 (1989) (the fact the doctor was not licensed at the time he administered the tests went to weight, not admissibility).

**{¶51}** Dr. Paul testified that Dr. Collier breached the standard of care by failing to interpret a complete ultrasound and by failing to recognize that a certain area of the popliteal vein appeared to show evidence of a clot. On the other hand, Drs. Collier and Cronan testified that Dr. Collier did not breach the standard of care because the ultrasound examination was complete and it did not show any signs of clots. Thus, the jury was faced with determining which evidence was more credible. In the eyes of the jury, none of the doctors had a tarnished record and all set forth exemplary credentials. Had they known that Dr. Collier's medical license had been suspended in two states, they may have given his expert medical opinion less weight.

**{¶52}** Furthermore, Dr. Cronan testified that he assumed Dr. Collier knew the hospital's protocol, which was not the case, and that if Dr. Collier did not know the hospital's protocol for venous ultrasounds, this was below the standard of care. This testimony coupled with testimony regarding Dr. Collier's suspended licenses, may have persuaded the jury to find Dr. Paul's testimony to be more credible.

**{¶53}** Given how close the evidence in this case was, had the trial court allowed appellant to use Dr. Collier's suspensions on cross examination, this could have affected the weight the jury gave to Dr. Collier's testimony, and likewise, the outcome of the case. As such, the trial court abused its discretion in disallowing the cross examination.

**{¶54}** Accordingly, appellant's second assignment of error has merit in part.

**{¶55}** For the reasons stated above, the judgment of the trial court is hereby reversed and the matter is remanded for further proceedings pursuant to law and consistent with this opinion.

Waite, P.J., concurs.

DeGenaro, J., concurs.