[Cite as *Horseman v. Mercy Health-Lorain Hosp.*, 2024-Ohio-1518.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

ZACHARY HORSEMAN

    Appellee

    v.

MERCY HEALTH-LORAIN HOSPITAL,
et al.

    Appellants

C.A. Nos.     22CA011894
                22CA011898

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     19CV199157

DECISION AND JOURNAL ENTRY

Dated: April 22, 2024

---

FLAGG LANZINGER, Judge.

**{¶1}** In Case No. 22CA011894, David M. Yin, M.D. appeals from the judgments of the Lorain County Court of Common Pleas. In Case No. 22CA011898, Mercy Health – Regional Medical Center, LLC dba Mercy Regional Medical Center ("Mercy Health") appeals from the same judgments. This Court consolidated the parties' appeals for purposes of the record, oral argument, and decision. For the following reasons, this Court reverses and remands the matter for further proceedings.

I.

**{¶2}** This appeal involves a medical malpractice case that centered around whether Dr. Yin, an emergency room physician at Mercy Health, breached the standard of care, and whether such breach proximately caused the death of Carole Horseman. While the record in this case is voluminous, this Court will limit its recitation of the facts and procedural history to those relevant to the disposition of this appeal.

**{¶3}** The record reflects that Ms. Horseman had a history of chronic and severe neck pain for which she received treatment. Relevant to this appeal, Ms. Horseman presented to the emergency room at Mercy Health four times in early September 2018: once on September 7th, once on September 9th, and twice on September 11th. On September 7th and 9th, Ms. Horseman presented with complaints of neck pain. On September 11th, Ms. Horseman presented with complaints of vomiting, nausea, and continued neck pain. Ms. Horseman was discharged after each visit.

**{¶4}** On the morning of September 12, 2018, Ms. Horseman collapsed in her home while getting dressed. Her son, Zachary Horseman, called 911. EMS transported Ms. Horseman to the hospital, and she died that morning. An autopsy subsequently confirmed that Ms. Horseman died of community-acquired MRSA pneumonia. The death certificate listed the "Approximate Interval Onset and Death" as "DAYS[.]"

**{¶5}** Zachary Horseman (individually and in his capacity as the administrator of Ms. Horseman's estate) ("Plaintiff") sued Mercy Health and Dr. Yin for wrongful death and negligence. In short, Plaintiff alleged that Dr. Yin breached the standard of care by failing to order certain tests that would have confirmed that Ms. Horseman had pneumonia and sepsis while she was in the ER on September 11th, which could have been successfully treated with MRSA antibiotics. Conversely, Dr. Yin argued that he did not breach the standard of care because there was no indication that Ms. Horseman had pneumonia or sepsis (and, therefore, no reason to order certain tests) while she was in the ER on September 11th, and that Ms. Horseman acquired MRSA pneumonia after her discharge from the ER. Additionally, Dr. Yin argued that, even if Ms. Horseman had been diagnosed with pneumonia and sepsis while in the ER, she would not have survived.

{¶6}     Relevant to this appeal, the record reflects that Plaintiff's counsel filed motions in limine two weeks before trial, including a motion in limine to exclude any evidence related to its infectious disease expert, John J. Cascone, M.D.'s, history of substance abuse from 2009.  Plaintiff asserted that, in September 2010, the Missouri Board of Registration for the Healing Arts placed Dr. Cascone's medical license on probation, which ended in September 2014.  Plaintiff asserted that Dr. Cascone admitted to his past issues with substance abuse, and that it was not relevant to his qualifications or bias in this case.

{¶7}     Dr. Yin responded in opposition, arguing that Dr. Cascone's past unlawful acts of fraud and dishonesty that led to his medical license being put on probation directly related to his credibility and character for truthfulness.  Dr. Yin argued that this evidence was admissible under Evid.R. 608(B) and that its probative value was not substantially outweighed by the danger of unfair prejudice.  As a result, Dr. Yin argued, he should be allowed to rely on such evidence to impeach Dr. Cascone at trial.  Dr. Yin also argued that Plaintiff's assertions regarding Dr. Cascone's past substance abuse downplayed Dr. Cascone's past misconduct, which–per publicly available documents from the Missouri Division of Professional Registration and/or the Missouri State Board of Registration for the Healing Arts–included: (1) possessing and using controlled substances, including cocaine, methamphetamine, and other prescription drugs without a valid prescription; (2) failure to "document the suppliers' or recipients' DEA number and date of receipt on his controlled substances receipt records and did not maintain complete controlled substance receipt records[;]" (3) failure to maintain a record of all controlled substances prescriptions; (4) prescribing "controlled substances in the absence of good faith, in the absence of properly established physician-patient relationship;" and (5) discovering in February 2008 that his wife "had been purchasing controlled substances and billing them to his account[,]" but failing to

"report the loss or diversion" to the appropriate board. Dr. Yin also asserted that Dr. Cascone violated the terms of his probation by using controlled substances and cocaine, which resulted in further disciplinary action and an additional term of probation. Dr. Yin argued that "Dr. Cascone's misconduct regarding controlled substances and fraudulent record keeping practices is directly relevant to his credibility, qualifications, and character for truthfulness as a purported medical expert witness * * *." (Emphasis omitted.) Dr. Yin also argued that the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice, and that the jury should be permitted to evaluate the impeachment evidence and weigh Dr. Cascone's testimony accordingly.

{¶8} The trial court granted Plaintiff's motion in limine regarding Dr. Cascone's past misconduct and licensure issues prior to trial without explaining its reasoning.

{¶9} Additionally, two weeks before the scheduled trial date, Dr. Yin filed numerous motions in limine, including a motion in limine to exclude Dr. Cascone's report and testimony during Plaintiff's case-in-chief at trial.[1] Dr. Yin based his motion on the fact that Plaintiff only identified Dr. Cascone as an expert after Dr. Yin had identified his experts, rendering Dr. Cascone's expert report untimely under the trial court's scheduling order. Dr. Yin also based his motion on the fact that neither the trial court's scheduling order nor the court's local rules provided for rebuttal reports.

---

[1] Several months before trial, the record also reflects that Dr. Yin moved to strike Dr. Cascone's expert report and to exclude Dr. Cascone from testifying at trial, which the trial court denied.

{¶10} Trial began as scheduled on March 28, 2022. According to Dr. Yin, the trial court denied his motion in limine on the morning of the start of trial.[2] Then, on the third day of trial, prior to Plaintiff calling Dr. Cascone as a witness, Dr. Yin renewed his objection to Dr. Cascone testifying during Plaintiff's case-in-chief. Dr. Yin argued that Plaintiff "named Dr. Cascone late as witness" and switched him from being its rebuttal witness, to being its sole case-in-chief causation expert (as opposed to Plaintiff's previously identified causation expert) on the first day of trial. The trial court overruled Dr. Yin's objection and permitted Dr. Cascone to testify during Plaintiff's case-in-chief as Plaintiff's sole causation expert.

{¶11} Immediately prior to Plaintiff calling Dr. Cascone as a witness, defense counsel proffered the fact Dr. Cascone "lost his license[3] due to the reasons that were set forth in our motions, back from 2009 to 2012, for narcotics issues, substance abuse issues, and then the three-year probation." The trial court noted defense counsel's objection to its ruling on Plaintiff's motion in limine regarding Dr. Cascone's past substance abuse and licensure issues but concluded that it would not allow defense counsel to cross-examine Dr. Cascone regarding those issues.

{¶12} With that procedural history in mind, we now turn to some of the testimony adduced at trial.

---

[2] Dr. Yin has not directed this Court to the portion of the record containing the trial court's ruling in this regard on the morning of the start of trial. *See* App.R. 16(A)(7). Presumably, the trial court's ruling occurred off the record. The record reflects that the trial court journalized its ruling on Dr. Yin's pre-trial motions in limine on April 5, 2022 (i.e., while the trial was still in process and after Dr. Cascone had testified on March 30, 2022). In doing so, the trial court held that "Defendant Yin's motion in limine to exclude testimony of Dr. John Cascone is denied. The rebuttal report was timely in light of the circumstances."

[3] On appeal, the parties do not dispute that Dr. Cascone's license was put on probation, not "lost[.]"

**Dr. Yin's Testimony**

{¶13} At trial, Plaintiff called Dr. Yin (as on cross-examination) as a witness. Dr. Yin testified that Ms. Horseman presented to the ER on September 11, 2018, around 9:00 a.m. with complaints of nausea, vomiting, and continued neck pain. Dr. Yin testified that he examined Ms. Horseman, and that she presented with no cough or fever, and that her lung exam was "[c]ompletely normal." After examining her, Dr. Yin gave Ms. Horseman fluids, a muscle relaxant, and an anti-inflammatory medication. Dr. Yin also entered certain orders, including an order for bloodwork and a CAT scan of Ms. Horseman's neck. The bloodwork was completed within an hour and showed that Ms. Horseman had an elevated white blood cell count of 15.9 (i.e., 15,900).

{¶14} Plaintiff's counsel questioned Dr. Yin regarding the Systemic Inflammatory Response Syndrome ("SIRS") criteria utilized at Mercy Health, which is used for evaluating whether a patient may be septic. The SIRS criteria utilized at Mercy Health include: (1) a respiratory rate of greater than or equal to 20[4]; (2) a white blood cell count over 12; (3) a fever over 100.4 degrees; and (4) a heart rate over 90. Dr. Yin acknowledged that the medical records indicate that if a patient meets two of the four SIRS criteria and there is a suspicion for an infection, then the patient is presumed to be septic. Dr. Yin also acknowledged that Mercy Health's electronic records system displays best practice advisory alerts ("BPAs") when a patient meets the SIRS criteria, which alert providers that a patient "may be septic." Dr. Yin further acknowledged that Ms. Horseman met two of the four SIRS criteria (i.e., white blood cell count over 12 and a

---

[4] Dr. Yin maintained that the SIRS criteria generally include a respiratory rate of over 20, but acknowledged that the SIRS criteria utilized at Mercy Health includes greater than or equal to 20. He also acknowledged that, even without considering Ms. Horseman's respiratory rate, she otherwise met at least two of the SIRS criteria during each visit on September 11th.

heart rate over 90), and that he received BPAs indicating that she "may be septic" during her first visit to the ER on September 11th.

{¶15} Dr. Yin testified that Ms. Horseman responded well to the pain medication and was discharged from the ER on September 11th around 11:30 a.m. While waiting for a ride home, Ms. Horseman complained that she felt dizzy and like she was going to "pass out[.]" Ms. Horseman was then re-admitted to the ER, and Dr. Yin examined her again.

{¶16} During the second visit, Ms. Horseman presented with a flat affect and three out of the four SIRS criteria, i.e., an elevated heart rate, respiratory rate, and white blood cell count. Dr. Yin ordered Ms. Horseman pain medication, fluids, and anti-nausea medication, and diagnosed her with dizziness. Dr. Yin acknowledged that he received BPAs indicating that Ms. Horseman may be septic at 2:34 p.m. during her second visit to the ER on September 11th, and that he discharged her from the ER around the same time. Dr. Yin also acknowledged that a nurse took Ms. Horseman's vitals at discharge (around 3:00 p.m.), and that Ms. Horseman continued to have three out of the four SIRS criteria at that time. Dr. Yin testified that he called Ms. Horseman after her discharge (possibly around 6:00 p.m.), and that Ms. Horseman told him she felt much better. Dr. Yin acknowledged, however, that there was no record of that phone call.

{¶17} When questioned by his own counsel on direct examination, Dr. Yin explained that Ms. Horseman denied having any cough, shortness of breath, or chest pain on September 11th, and that he examined her lungs, which were normal. Dr. Yin also explained that Ms. Horseman presented with no signs or symptoms of an infection during her first or second visit to the ER on September 11th, and that Ms. Horseman had no physical findings of pneumonia. Dr. Yin further explained that BPAs are "merely suggestions[,]" and that when he received them for Ms. Horseman, his job was to "reassess the patient and dive further[,]" which he did. Dr. Yin explained

that Ms. Horseman's SIRS criteria (i.e., her elevated white blood cell count, respiratory rate, and/or heart rate) could be explained by causes other than an infection, such as Ms. Horseman's medications, pain, anxiety, COPD, history of smoking, and/or her recent steroid use. Dr. Yin explained that he, therefore, ruled out the possibility of an infection based upon Ms. Horseman's history and physical exams. Dr. Yin ultimately opined that he met the standard of care.

{¶18} When cross-examined by Plaintiff's counsel, Dr. Yin acknowledged that medical literature advises that, if a patient meets two SIRS criteria plus there is a suspicion of infection, then providers should consider a chest x-ray. Dr. Yin also acknowledged that he did not order a chest x-ray for Ms. Horseman on September 11th.

## Plaintiff's Expert Testimony

{¶19} Plaintiff presented testimony from Richard Zane, M.D., an emergency medicine physician, who opined that Dr. Yin failed to meet the standard of care on September 11, 2018. Dr. Zane explained that, if a patient (like Ms. Horseman) meets the SIRS criteria, then the next step is to consider whether there is an infectious source for those criteria. Dr. Zane explained that, if an infectious source cannot be ruled out, then the next step is to treat the patient as though they have sepsis, or to perform more tests. Dr. Zane opined that a reasonably skilled, prudent emergency room doctor presented with Ms. Horseman's circumstances should have suspected an infection and either treated Ms. Horseman as though she had sepsis or should have ordered a lactate test (which is a blood test) and a chest x-ray, which Dr. Yin failed to do. Dr. Zane explained that if either the lactate was elevated or the chest x-ray showed pneumonia, the next step would be to administer antibiotics. Dr. Zane also explained that, if a patient does not improve after receiving antibiotics, then the patient "can't go home."

{¶20} Additionally, Dr. Zane explained that the fact that Dr. Yin documented a normal chest exam on physical examination did not change his opinion because patients presenting with normal chest exams can still have pneumonia. Dr. Zane also explained that, while there could be reasonable, non-sepsis explanations for certain symptoms, taken together in Ms. Horseman's case, "you must consider sepsis."

{¶21} On cross-examination, Dr. Zane acknowledged that he was not offering an opinion as to what a chest x-ray or lactate test would have shown had they been performed on September 11th; he was only opining that the standard of care required Dr. Yin to order those tests. Dr. Zane also acknowledged that he did not know whether Ms. Horseman would have survived had she been admitted to the hospital on September 11th and treated for pneumonia.

{¶22} Plaintiff also presented expert testimony from Dr. Cascone, an internal medicine and infectious disease specialist, as the causation expert. Dr. Cascone opined that Ms. Horseman had pneumonia and sepsis when she presented to the ER on September 11th. Dr. Cascone opined that, if Dr. Yin had ordered a chest x-ray, it would have shown pneumonia on September 11th. Dr. Cascone explained that Ms. Horseman would have then been admitted to the hospital and treated with penicillin-like antibiotics, that she would have continued to decline, and that she would have then been treated with MRSA antibiotics, such as Vancomycin. Dr. Cascone opined that, had Ms. Horseman been admitted to the hospital and treated with MRSA antibiotics, she would have survived.

{¶23} During his testimony, Dr. Cascone indicated that he agreed with the death certificate indicating that Ms. Horseman's cause of death was acute bronchopneumonia, and that the "Approximate Interval Onset and Death" was "DAYS[.]" Dr. Cascone explained that the

autopsy report showed an overwhelming MRSA infection that went untreated in Ms. Horseman's lungs, spread into her blood, and then spread to the rest of her body, which caused her death.

### Dr. Yin's Expert Testimony

{¶24} Dr. Yin, on the other hand, presented testimony from Michael Dick, M.D., an emergency medicine physician, who opined that Ms. Horseman did not have pneumonia and was not septic during her ER visits on September 11th, and that Dr. Yin met the standard of care. Dr. Dick explained that Ms. Horseman had no signs or symptoms consistent with pneumonia or an infection, and that nothing in Ms. Horseman's history or on her physical exam would have required Dr. Yin to obtain a chest x-ray or order a lactate test.

{¶25} On cross-examination, Plaintiff's counsel asked Dr. Dick whether it was a coincidence that Ms. Horseman died of MRSA pneumonia 20 hours after her discharge from the ER. Dr. Dick responded that there were alternative, appropriate explanations for Ms. Horseman's symptoms, and that Ms. Horseman did not have pneumonia or sepsis while in the ER on September 11th. Regarding the BPAs, Dr. Dick explained that they "did not apply because [Ms. Horseman] did not have an indication of infection * * *."

{¶26} Dr. Yin also presented testimony from Marin Kollef, M.D., a pulmonary critical care specialist, who opined that Dr. Yin met the standard of care. Dr. Kollef explained that nothing required Dr. Yin to order a chest x-ray or lactate test, and that–even if he had–those results would have been normal (except for signs of emphysema on the x-ray). Dr. Kollef explained that there was nothing to indicate that Ms. Horseman had pneumonia, an infection, or sepsis while at the ER on September 11th, and that Dr. Yin should not have suspected pneumonia or sepsis. Dr. Kollef opined that the MRSA pneumonia occurred after Ms. Horseman left the ER on September 11th, and the fact that she had been in the ER the day prior to her death was a "coincidence[.]" In doing

so, Dr. Kollef disagreed with the death certificate indicating that the interval from onset to death was "DAYS[.]" Dr. Kollef also opined that nothing Dr. Yin did or did not do proximately caused Ms. Horseman's death, and that Ms. Horseman would have died whether she had been admitted to the hospital on September 11th or not.

{¶27} Lastly, Dr. Yin presented testimony from Robert Citronberg, M.D., an infectious disease physician, who opined that Ms. Horseman did not have pneumonia or sepsis while in the ER on September 11th. Dr. Citronberg explained that Ms. Horseman had no signs or symptoms of pneumonia on September 11th, and that it would be "virtually impossible" not to have signs or symptoms of pneumonia at the time of presentation. Dr. Citronberg also explained that, while Ms. Horseman met the SIRS criteria, the most important part of diagnosing sepsis is a known or suspected infection, neither of which Ms. Horseman had on September 11th. Dr. Citronberg explained that, even if admitted to the hospital, patients with community-acquired pneumonia with no MRSA risk factors (like Ms. Horseman) would not initially be treated with MRSA antibiotics. Dr. Citronberg explained that MRSA can cause death within hours and opined that–even if Ms. Horseman would have been admitted to the hospital–she would not have survived.

{¶28} Additionally, like Dr. Kollef, Dr. Citronberg testified that Ms. Horseman's pneumonia began after she was discharged from the ER on September 11th. He testified that, while he agreed with the coroner's conclusion that Ms. Horseman died of community-acquired MRSA pneumonia, he disagreed with the conclusion that the interval between onset and death was "DAYS[.]" On cross-examination, Dr. Citronberg admitted that part of his opinion was based upon Dr. Yin's claim that he called Ms. Horseman after her discharge from her ER, and that Ms. Horseman told Dr. Yin that she was doing better.

## The Jury's Verdict

{¶29}  Six of the eight jurors ultimately returned a verdict in favor of Plaintiff, awarding $6.5 million in damages.  In the jury interrogatories, the jury indicated that: (1) it found Dr. Yin negligent by a preponderance of the evidence by "[i]gnoring the BPAs and not ordering the chest x-ray and lactase [sic] tests[;]" (2) it found by a preponderance of the evidence that Dr. Yin's negligence proximately caused Ms. Horseman's death; and (3) Ms. Horseman's two adult children were entitled to $500,000 each for the loss of services and society of their mother suffered to date, $500,000 each for mental anguish suffered to date, $1,750,000 each for the loss of services and society of their mother likely to be suffered in the future, and $500,000 each for mental anguish likely to be suffered in the future.

{¶30}  After the trial, Dr. Yin and Mercy Health (collectively, "Defendants") moved for a new trial or, in the alternative, for judgment notwithstanding the verdict, which the trial court denied.

## Issues on Appeal

{¶31}  On appeal, Dr. Yin and/or Mercy Health challenge numerous rulings by the trial court, including the trial court's decision to: (1) allow Dr. Cascone to testify during Plaintiff's case-in-chief; (2) prevent Dr. Yin from impeaching Dr. Cascone with certain evidence; (3) preclude Dr. Yin from presenting evidence or referencing the "many suspect circumstances surrounding" Ms. Horseman's death; (4) instruct the jury that Mercy Health had stipulated that it was responsible for the conduct of Dr. Yin; and (5) deny Dr. Yin's motion for directed verdict and judgment notwithstanding the verdict.  Dr. Yin and/or Mercy Health also challenge the weight and sufficiency of the evidence, as well as the amount of the jury's damages award.  Lastly, Defendants argue that the cumulative effect of the trial court's errors warrants a new trial.  This Court will

address Dr. Yin's third assignment of error and Mercy Health's second assignment of error together, and first.

## II.

### DR. YIN'S ASSIGNMENT OF ERROR III

THE TRIAL COURT ABUSED ITS DISCRETION IN PREVENTING DR. YIN FROM IMPEACHING PLAINTIFF'S REBUTTAL EXPERT, DR. CASCONE, WITH EVIDENCE OF HIS PAST UNLAWFUL ACTS OF FRAUD, DISHONESTY AND DECEIT.

### MERCY HEALTH'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED WHEN IT EXCLUDED EVIDENCE RELEVANT TO THE CREDIBILITY, BIAS, AND WEIGHT OF DR. CASCONE AND HIS OPINIONS, SPECIFICALLY DR. CASCONE'S PAST UNLAWFUL ACTS OF FRAUD, DISHONESTY, AND DECEIT–IN CONNECTION WITH HIS MEDICAL PRACTICE–WHICH LED TO (AMONG OTHER THINGS) A THREE-YEAR HIATUS FROM PRACTICING MEDICINE AND THE PROBATION OF HIS MEDICAL LICENSE FOR SEVERAL YEARS.

{¶32} In Dr. Yin's third assignment of error and Mercy Health's second assignment of error, Defendants argue that the trial court erred by preventing Dr. Yin from impeaching Dr. Cascone with evidence regarding Dr. Cascone's past misconduct, which led to the probation of his medical license. In support of their argument, Defendants rely, in part, on Evid.R. 608(B). In response, Plaintiff argues that this evidence was not admissible under Evid.R. 608(B) and that, even if it was, any relevance was substantially outweighed by the danger of unfair prejudice. For the following reasons, this Court determines that Dr. Yin's third assignment of error and Mercy Health's second assignment of error have merit.

{¶33} Evid.R. 608(B) provides:

Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness

(1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

**{¶34}** Regarding Evid.R. 403(A), this Court has explained:

Evidence that falls within the scope of Evid.R. 608(B) is subject to Evid.R. 403(A), which provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." * * * The exclusion of relevant evidence under Evid.R. 403(A) rests within the discretion of the trial court. * * * When considering a trial court's decision to exclude evidence under Evid.R. 403(A), this Court is "mindful that 'the exclusion of evidence under Evid.R. 403(A) is even more of a judgment call than determining whether the evidence has logical relevance in the first place.'"

*State v. Vugrinovich*, 9th Dist. Medina No. 19CA0067-M, 2020-Ohio-3541, ¶ 22.

**{¶35}** "Given the broad discretion accorded to trial courts to admit or exclude evidence, this Court 'will not disturb evidentiary rulings absent an abuse of discretion 'that produced a material prejudice' to the aggrieved party.'" *Somerick v. YRC Worldwide Inc.*, 9th Dist. Summit No. 29239, 2020-Ohio-2916, ¶ 6, quoting *In re I.W.*, 9th Dist. Wayne Nos. 07CA0056 and 07CA0057, 2008-Ohio-2492, ¶ 8. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). "Material prejudice exists when, after weighing the prejudicial effect of the errors, the reviewing court is unable to find that without the errors the fact finder would probably have reached the same decision." *In re Moore*, 9th Dist. Summit No. 19217, 1999 WL 1215294, *17 (Dec. 15, 1999); *Estate of Cushing v. Kuhns*, 9th Dist. Lorain No. 97CA006981, 1999 WL 74626, *3 (Feb. 9, 1999).

{¶36} Even if a trial court makes an improper evidentiary ruling, such ruling "constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 35. "Generally, in order to find that substantial justice has been done to [a party] so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision." (Alteration sic.) *Id.*, quoting *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165 (1980).

{¶37} As discussed above, the record reflects that Plaintiff's counsel filed motions in limine two weeks before trial, including a motion in limine to exclude any evidence of Dr. Cascone's history of substance abuse and related probation of his medical license. Dr. Yin responded in opposition, arguing that Dr. Cascone's past unlawful acts directly related to his credibility and character for truthfulness, and that he should be allowed to rely on such evidence to impeach Dr. Cascone at trial. Specifically, Dr. Yin pointed to the following misconduct: (1) possessing and using controlled substances, including cocaine, methamphetamine, and other prescription drugs without a valid prescription; (2) failure to "document the suppliers' or recipients' DEA number and date of receipt on his controlled substances receipt records and did not maintain complete controlled substance receipt records[;]" (3) failure to maintain a record of all controlled substances prescriptions; (4) prescribing "controlled substances in the absence of good faith, in the absence of properly established physician-patient relationship;" and (5) discovering in February 2008 that his wife "had been purchasing controlled substances and billing them to his account[,]" but failing to "report the loss or diversion" to the appropriate board. In support of his argument, Dr. Yin relied, in part, on Evid.R. 608(B). As noted, the trial court granted

Plaintiff's motion in limine regarding Dr. Cascone's past misconduct prior to trial without explaining its reasoning.

{¶38} At trial, immediately prior to Plaintiff calling Dr. Cascone as a witness, defense counsel proffered the fact Dr. Cascone "lost his license due to the reasons that were set forth in our motions, back from 2009 to 2012, for narcotics issues, substance abuse issues, and then the three-year probation." In addressing the issue, the trial court stated:

> With respect to his treatment for substance abuse, I mean, that's an issue that the Courts deal with in all kinds of – in all kinds of cases, and we're trying to help people rehabilitate themselves and get themselves back as productive citizens. For that reason, the fact that he had difficulty with substance abuse, I've already ruled that that would not be something we would discuss. And the fact that that affected his license prior to his review of anything in this case, I think – would be unfairly prejudicial, and we're not going to get into the fact that he did not have a license for a period of a few years because that was entirely related to his treatment for substance abuse. And that would just allow you to open that door, and I've said that that would be unfairly prejudicial.
>
> Had this been a situation where the expert was reviewing and coming up with his opinion in the midst of substance abuse treatment, then I might have a different feeling about his credibility as a witness, because it might have affected his judgment. But there being no – we're not getting into that at this point. This is something he dealt with in the past, and I just think it would be inappropriate.

{¶39} Defense counsel then reminded the trial court that the "loss" of Dr. Cascone's license for three years was for recordkeeping issues. The trial court responded:

> I understood that the link to the recordkeeping may have been related to his substance abuse at the time[.] * * * I saw it all as once we * * * open that door, it's a mess, and I think it's unfairly prejudicial.

{¶40} The trial court did not cite an evidentiary rule when making its ruling. The trial court's language regarding the evidence being "unfairly prejudicial[,]" however, indicates that the trial court relied–at least in part–upon Evid.R. 403(A).

{¶41} Consistent with the trial court's ruling, defense counsel did not question Dr. Cascone about his prior license probation and disciplinary history during cross-examination.

During his direct examination, however, Dr. Cascone testified regarding his training, education, and experience as a medical doctor.

{¶42} This Court concludes that the trial court abused its discretion by precluding defense counsel from cross-examining Dr. Cascone regarding the fact that his medical license had been put on probation for a period of time. "Courts have found that a physician-witness's licensure is a matter that affects the weight to be given to their testimony." *Cleveland v. St. Elizabeth Health Ctr.*, 7th Dist. Mahoning No. 10-MA-151, 2012-Ohio-1472, ¶ 50 (addressing Evid.R. 601); *see State v. Awkal*, 76 Ohio St.3d 324, 332 (1996) (acknowledging that an expert's licensure goes to the weight of the expert's testimony). When a medical expert testifies as to his training, education, and experience, the expert is "building up his credentials in front of the jury so that, presumably, they would give more weight to his medical opinion * * *." *Id.* at ¶ 49. As a result, that expert puts his professional credentials at issue, and a trial court should allow that expert to be cross-examined regarding certain licensure issues. *Id.* Otherwise, the jury is given "the impression that his professional credentials were untarnished when this was not the case." *Id.* While "counsel cannot challenge a witness's credibility with evidence of bad moral character[,] * * * [c]ounsel may, however, impeach a witness on cross-examination by questions about prior misconduct which relate directly to truthfulness." *Weidner v. Blazic*, 98 Ohio App.3d 321, 327 (12th Dist.1994), citing *State v. Shields*, 15 Ohio App.3d 112, 113 (8th Dist.1984) and Evid.R. 608(B).

{¶43} Here, the trial court emphasized the fact that Dr. Cascone's license probation related to his issues with substance abuse, and that courts are "trying to help people rehabilitate themselves and get themselves back as productive citizens." The trial court stated that, "[f]or that reason, the fact that [Dr. Cascone] had difficulty with substance abuse, I've already ruled that that would not be something we would discuss[,]" and later concluded that such evidence would be

"inappropriate." But that is not the standard under Evid.R. 403(A), nor does it account for the other misconduct that led to Dr. Cascone's license probation (e.g., his problematic recordkeeping).

{¶44} While drug use does not necessarily affect a witness's character for truthfulness, the probation of an expert witness's medical license due to deceptive and/or dishonest acts is probative of that witness's character for truthfulness and is admissible under Evid.R. 608(B). *State v. Everson*, 7th Dist. Mahoning No. 12 MA 128, 2016-Ohio-87, ¶ 35 ("Drug use does not necessarily affect a witness's character for truthfulness" for purposes of Evid.R. 608(B)); *see Weidner* at 327-328. Additionally, while the trial court did note that evidence of Dr. Cascone's license probation would be unfairly prejudicial, it provided no analysis as to whether the danger of unfair prejudice "substantially outweighed" any probative value of that evidence under Evid.R. 403(A). *See Haynal v. Nordonia Hills City School Dist. Bd. of Edn.*, 9th Dist. Summit No. 25242, 2011-Ohio-3191, ¶ 17 (concluding, in part, that the trial court misapplied Evid.R. 403(A) because the trial court never concluded that the danger of unfair prejudice substantially outweighed the probative value of the evidence).

{¶45} As noted, an expert's licensure is a matter that affects the weight of the expert's testimony. *St. Elizabeth Health Ctr.* at ¶ 50. This case hinged upon which set of experts the jury chose to believe, yet Dr. Cascone was able to "give the jury the impression that his professional credentials were untarnished when this was not the case." *Id.* at ¶ 49. Given the facts of this case, had the trial court allowed defense counsel to cross-examine Dr. Cascone regarding his past licensure issues, this evidence may have affected the weight the jury gave to Dr. Cascone's medical opinions and–in turn–the outcome of the case. *Id.* at ¶ 51, 53 (holding that the trial court abused its discretion by not allowing the defendant/medical expert to be cross-examined regarding certain licensure issues, which could have affected the weight the jury gave to his medical opinions); *see*

*Weidner* 98 Ohio App.3d at 328 (holding that the trial court did not err by allowing plaintiff's counsel to cross-examine the defendant/dentist regarding his probationary status with the Ohio State Dental Board). As a result, the trial court committed reversible error by precluding defense counsel from cross-examining Dr. Cascone regarding his past licensure issues. *See Beard*, 2005-Ohio-4787, at ¶ 35 (explaining that an improper evidentiary ruling "constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice."). Dr. Yin's third assignment of error and Mercy Health's second assignment of error are sustained on that basis.

DR. YIN'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN ALLOWING PLAINTIFF TO CALL HIS REBUTTAL EXPERT, DR. JOHN CASCONE, IN HIS CASE-IN-CHIEF.

DR. YIN'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN DENYING DR. YIN'S MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT.

DR. YIN'S ASSIGNMENT OF ERROR IV

THE TRIAL COURT ABUSED ITS DISCRETION IN PRECLUDING DR. YIN FROM PRESENTING RELEVANT EVIDENCE AND/OR REFERENCING THE MANY SUSPECT CIRCUMSTANCES SURROUNDING DECEDENT'S DEATH.

DR. YIN'S ASSIGNMENT OF ERROR V

THE TRIAL COURT ABUSED ITS DISCRETION BY INFORMING AND INSTRUCTING THE JURY ON CO-DEFENDANT MERCY HEALTH'S STIPULATION OF AGENCY BY ESTOPPEL WITH RESPECT TO DR. YIN'S CARE OF DECEDENT.

DR. YIN'S ASSIGNMENT OF ERROR VI

THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

DR. YIN'S ASSIGNMENT OF ERROR VII

THE JURY RETURNED AN EXCESSIVE VERDICT THAT WAS CLEARLY RENDERED UNDER THE INFLUENCE OF PASSION AND PREJUDICE AND WAS PUNITIVE ON ITS FACE.

DR. YIN'S ASSIGNMENT OF ERROR VIII

THE CUMULATIVE EFFECT OF THE TRIAL COURT'S ERRORS DENIED DR. YIN A FAIR TRIAL.

MERCY HEALTH'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED WHEN IT ALLOWED PLAINTIFF TO UTILIZE JOHN CASCONE, M.D. AS A "REBUTTAL" EXPERT AND FURTHER ERRED WHEN, ON THE FIRST DAY OF TRIAL, THE TRIAL COURT ALLOWED DR. CASCONE TO TESTIFY IN PLAINTIFF'S CASE-IN-CHIEF AND SERVE AS PLAINTIFF'S SOLE CAUSATION EXPERT.

MERCY HEALTH'S ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED WHEN IT EXCLUDED EVIDENCE AND/OR REFERENCE TO MS. HORSEMAN'S NARCOTIC PRESCRIPTIONS AND THE CIRCUMSTANCES SURROUNDING HER DEATH.

MERCY HEALTH'S ASSIGNMENT OF ERROR IV

THE JURY'S VERDICT IS AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE BECAUSE PLAINTIFF'S SOLE STANDARD OF CARE EXPERT, DR. ZANE, DID NOT TESTIFY THAT THE STANDARD OF CARE REQUIRED DR. YIN TO PRESCRIBE MRSA-FIGHTING MEDICATION TO MS. HORSEMAN–WHICH WAS A CRITICAL ASPECT TO PLAINTIFF'S CAUSATION THEORY.

MERCY HEALTH'S ASSIGNMENT OF ERROR V

A NEW TRIAL SHOULD BE GRANTED PURSUANT TO THE CUMULATIVE ERROR DOCTRINE.

{¶46} In light of this Court's disposition of Dr. Yin's third assignment of error and Mercy Health's second assignment of error, the remaining assignments of error are moot and are overruled on that basis. *See* App.R. 12(A)(1)(c).

III.

{¶47}   Dr. Yin's third assignment of error in Case No. 22CA011894 and Mercy Health's second assignment of error in Case No. 22CA011898 are sustained.  The remaining assignments of error are overruled on the basis that they are moot.  The judgment of Lorain County Court of Common Pleas is reversed, and the matter is remanded for further proceedings.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

JILL FLAGG LANZINGER
FOR THE COURT

HENSAL, P. J.
STEVENSON, J.
CONCUR.

APPEARANCES:

RYAN K. RUBIN, Attorney at Law, for Appellant.

DOUGLAS G. LEAK, Attorney at Law, for Appellant.

DIRK E. RIEMENSCHNEIDER and FRED A. HILOW, Attorneys at Law, for Appellant.

JUSTIN S. GREENFELDER, Attorney at Law, for Appellant.

DENNIS R. LANSDOWNE and DUSTIN B. HERMAN, Attorneys at Law, for Appellee.